



**FILED**

9/29/2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

**RECEIVED**

AUG 20 2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| Kimberly Jean Brown | ) | |
| | ) | Case No._____ |
| vs. | ) | |
| | ) | 20-cv-04893 |
| Michelle Montgomery | ) | Judge **Judge Andrea R. Wood** |
| | | **Magistrate Judge Gabriel A. Fuentes** |
| Erika Williams, | ) | |
| Lila Goldston, | ) | Magistrate Judge: |
| JP Morgan Chase Co, and, | ) | Jury Trial Demanded |
| James D. Montgomery &. | ) | |
| Associates, Ltd. | ) | |

## COMPLAINT - DEFAMATION & OTHER TORTS

(28 U.S.C. Section 1332; Diversity of Citizenship)

**PARTIES**

**1. PLAINTIFF**

Kimberly Jean Brown

(mailing address only)

1026 E. 46th St, Unit 2E

Chicago, IL, 60653

773-673-0324

Kim@NotByLuck.net

## 2. **DEFENDANTS**

Defendant 1

Michelle Montgomery

James D. Montgomery & Associates, Ltd

33 W. Monroe, Suite 1375

Chicago, IL 60603

MMM@JDMLaw.com

312-977-0200

("Defendant Montgomery")


Defendant 2

Erika Williams

JP Morgan Chase Bank

1204 E. 53rd St

Chicago, IL. ~~69615~~  60615  KJB

773-241-5110

("Defendant Williams")

Defendant 3

Lila Goldston

5201 S. Cornell, Unit 25D K20

Chicago, Il 60615

LilaGoldston@yahoo.com

("Defendant Goldston")


Defendant 4

JP Morgan Chase & Co

270 Park Avenue

New York, NY 10017 K20

212-270-6000

("Defendant JP Morgan")


Defendant 5

James D. Montgomery & Associates, Ltd

33 W. Monroe, Suite 1375

Chicago, IL 60603

MMM@JDMLaw.com

312-977-0200

("Defendant Montgomery Law")

## BASIS FOR JURISDICTION

3. **Jurisdiction**. This Court has jurisdiction of this matter under 28 U.S.C. Section 1332, diversity of citizenship.

4. **Plaintiff**. The plaintiff, Kimberly Jean Brown, is a citizen of the State of North Carolina.

5. **Defendants**.

   a. The defendant, Michelle Montgomery ("Defendant Montgomery"), is a citizen of the State of Illinois.

   b. The defendant, Erika Williams ("Defendant Williams"), is a citizen of the State of Illinois.

   c. The defendant, Lila Goldston ("Defendant Goldston"), is a citizen of the State of Illinois. Defendant Montgomery, Defendant Williams and Defendant Goldston are hereinafter referred to together as "Defendants."

   d. The defendant, JP Morgan Chase & Co ("Defendant JP Morgan"), is incorporated under the laws of the state of New York and has its principal place of business in the State of New York.

   e. The defendant, James D. Montgomery & Associates, Ltd. ("Defendant Montgomery Law"), is incorporated under the laws of the state of Illinois and has its principal place of business in the State of Illinois. Defendant JP Morgan and Defendant Montgomery Law are hereinafter referred to together as "Corporate Defendants."

6. **Amount**. The amount in controversy is over $75,000. Specifically, Plaintiff seeks an amount in excess of $1,389,000 in actual damages, plus statutory, punitive and exemplary damages, attorneys' fees and litigation-related costs

## BACKGROUND & STATEMENT OF CLAIMS

7. Plaintiff, an African-American woman, has been an attorney in Illinois for 25 years. Most recently, Plaintiff's practice was focused on living trust based estate planning for middle and lower income individuals. However, Plaintiff has ceased practicing and is unemployed due to the events described herein.

8. Plaintiff desired to offer high-quality living trust planning to more individuals at lower prices. It was that desire which drove Plaintiff to create the Predecessor Company.

9. Plaintiff designed the predecessor to Legacy Complete ("Predecessor Company") in the Goldman Sachs 10,000 Small Businesses Program.

10. In 2014, Plaintiff won first place in a city-wide business pitch competition for her pitch of the Predecessor Company.

11. Plaintiff embarked on the creation of living trust software through the Predecessor Company in 2014.

12. In February 2015, Plaintiff began an online fundraiser to raise $25,000 to complete estate planning software for the Predecessor Company.

13. One of Plaintiff's former clients, Dr. Charles V. Hamilton, JD, PhD, learned of the fundraiser and offered to donate the entire $25,000. However, Plaintiff refused to accept the offered $25,000 because Owner Hamilton was a former client of Plaintiff.

14. Owner Hamilton is a political scientist and was a leader in the civil rights movement. He is most widely known for his book, "Black Power: The Politics of Liberation" written in 1967 during the height of the civil rights movement.

15. Plaintiff was initially introduced to Dr. Hamilton by Erika Williams ("Defendant Williams") who was an agent of Defendant JP Morgan and Dr. Hamilton's financial adviser. Dr. Hamilton together with his living trust are referenced herein as "Owner Hamilton."

16. Defendant Williams received Plaintiff's information from Defendant Williams's colleague at the 1204 E. 53rd St, Chicago, IL, Chase Bank location of Defendant JP Morgan. Defendant JP Morgan's agents and employees at this location, as well as the location itself, are referred to together herein as "53rd St Chase".

17. During the years of 2010-2015, Plaintiff received several estate planning client referrals from 53rd St Chase.

18. Consistently, clients who were referred to Plaintiff from 53rd St Chase reported back to 53rd St Chase that they were very satisfied with Plaintiff's services. To Plaintiff's knowledge, Plaintiff never received an unfavorable review from 53rd St Chase referrals prior to the Disinformation Campaign, as later defined herein.

19. Having had an opportunity to review several trusts that Plaintiff created for Defendant JP Morgan's customers, 53rd St Chase repeatedly complimented Plaintiff on the high quality of trusts that Plaintiff prepared and Plaintiff's commitment to customer service.

20. In addition to being a former client, Owner Hamilton had become a friend and mentor to Plaintiff. Owner Hamilton would invite Plaintiff to lunch several times a month. Those

lunches typically focused on Owner Hamilton's interest in writing a book of essays

critiquing the civil rights movement which book he tentatively entitled, Lessons Learned.

21. Owner Hamilton wanted Plaintiff's help finding authors for essays from each of the post

civil-rights generations. Plaintiff helped Owner Hamilton identify several individuals,

from three generations, interested in writing essays for Owner Hamilton's book. Plaintiff

introduced Owner Hamilton to many of the potential authors during several dinners

Owner Hamilton hosted at his home.

22. Owner Hamilton introduced Lila Goldston ("Defendant Goldston") to Plaintiff during

one of those dinners. Defendant Goldston's business card listed her title as "Consultant"

and Owner Hamilton introduced Defendant Goldston as his business manager.

23. Following the dinner at which he introduced Defendant Goldston to Plaintiff, Owner

Hamilton requested that Plaintiff discuss the Predecessor Company, and the capital it

needed, with his business manager.

24. Plaintiff agreed and made a formal presentation of Predecessor Company to Defendant

Goldston. Owner Hamilton was present but remained silent.

25. Following the presentation, Defendant Goldston informed Plaintiff that Defendant

Goldston liked the concept and wanted to invest in the business. However, Defendant

Goldston stated that she believed Plaintiff needed to raise more than $25,000 for the

business to be viable. Defendant Goldston instructed Plaintiff to draft a proposal

("Requested Proposal") which included:

    a.  reorganizing Predecessor Company under a new entity,

    b.  scrapping the existing software, and,

      c.  completely rebuilding the software.

26. Plaintiff prepared the Requested Proposal and presented it to Defendant Goldston with Owner Hamilton present. The Requested Proposal, which included 1-year, 3-year and 7-year budgets for the new entity (Legacy Complete), estimated that $125,000 would be required to meet Defendant Goldston's criteria. The budgets included a line item for Plaintiff's compensation which amount averaged $100,000/year plus bonuses.

27. Following Plaintiff's presentation of the Requested Proposal, Defendant Goldston contacted Plaintiff and expressed that Owner Hamilton wanted to invest the entire $125,000. As conditions, Defendant Goldston required that Plaintiff must agree to the following:

      a.  agree to perform the items in the Requested Proposal,

      b.  agree to give Owner Hamilton 25% ownership of the new entity, and,

      c.  agree to have a provision in the new entity's operating agreement that no additional investors could be brought into the new entity without Owner Hamilton's approval.

28. Initially, Plaintiff remained hesitant to move forward with Owner Hamilton because of several conflicts of interest. Plaintiff discussed her conflicts of interest with Defendant Goldston, with Owner Hamilton present:

      a.  that the owner of the Predecessor Company was Plaintiff's family trust ("Owner BW Trust"),

      b.  that Plaintiff was the trustee of Owner BW Trust,

    c.  that Plaintiff was the manager of the Predecessor Company and she would also be the manager of the new entity, and

    d.  that Owner Hamilton was Plaintiff's former estate planning client.

29. In addition, Plaintiff discussed that she was hesitant because Owner Hamilton was a former client in his eighties. Although Owner Hamilton showed no sign of cognitive decline and was, at the time, writing two books and outlining a third, Plaintiff was concerned about accepting an investment who was a former client.

30. Plaintiff gave Defendant Goldston a memorandum of understanding which outlined Plaintiff's concerns ("Conflicts Letter") and asked Defendant Goldston to discuss them further with Owner Hamilton privately.

31. To overcome Plaintiff's objections, Defendant Goldston explained that, unbeknownst to Plaintiff, Owner Hamilton desired to invest in up to five woman-owned businesses to honor his late daughter who was an entrepreneur. Defendant Goldston stated that her business and Defendant Williams' were the first recipients of Owner Hamilton's woman-owned business investments.

32. In addition, Defendant Goldston mentioned that Owner Hamilton wanted to amend his estate planning to fund a foundation to support women-owned businesses.

33. Although Plaintiff thought the foundation was a good idea, Plaintiff reminded Defendant Goldston that Plaintiff would not be able to act as Owner Hamilton's attorney if Plaintiff accepted Owner Hamilton's offer to invest.

34. Ultimately, Plaintiff accepted Owner Hamilton's offer with three stipulations:

    a.   Plaintiff required that Defendant Goldston, his business manager, be the point of contact for Owner Hamilton's investment,

    b.   Plaintiff insisted that Owner Hamilton **not** input the entire $125,000 of capital into Legacy Complete in one lump sum, but instead input the capital as needed, and only after Defendant Goldston reviewed and approved all of Plaintiff's previous expenditures, and,

    c.   Plaintiff insisted on hosting monthly progress meetings so that Plaintiff could update Defendant Goldston and Owner Hamilton.

35. Defendant Goldston agreed to Plaintiff's terms and Legacy Complete was formed in May 2015.

36. Unfortunately, a few days later, Owner Hamilton's wife of more than fifty years died. Plaintiff contacted Owner Hamilton to extend Plaintiff's condolences. Plaintiff also contacted Defendant Goldston and offered to cancel Owner Hamilton's investment if Owner Hamilton desired to cancel it. Defendant Goldston spoke to Owner Hamilton and Owner Hamilton expressed that he was more interested than ever in moving forward with Legacy Complete.

37. Legacy Complete was formed in Nevada as a limited liability company on May 14, 2015 as Entity Number E0239522015-0 and Business ID NV20151304824 ("Nevada License"). The Nevada License was revoked in May 2017 for failure to submit an annual statement and pay the required fee.

    a. Legacy Complete has not been formally dissolved and remains owned as follows: 25% by Owner Hamilton and 75% by the Brown Washington Trust ("Owner BW Trust").

38. Shortly after forming Legacy Complete, Plaintiff realized that she neglected to account for the repayment of the existing debt on the Predecessor Company in the budgets Plaintiff had provided to Defendant Goldston. The existing debt amounted to $35,000 loaned to the Predecessor Company by Plaintiff's friends and family.

39. Plaintiff contacted Defendant Goldston to discuss Plaintiff's oversight. Plaintiff and Defendant Goldston agreed that, to avoid depleting capital, Plaintiff's compensation would temporarily be deferred to repay the loans. Accordingly, a significant percentage of the compensation that was due to Plaintiff was used to repay the Predecessor Company's unpaid debt.

40. Plaintiff and Defendant Goldston also agreed that once an accountant was hired, the accountant would determine how to account for the debt and pay Plaintiff's deferred salary. However, due to Legacy Complete's financial situation, the hiring of an accountant was delayed until after Legacy Complete had fully launched which never happened.

41. Although an accountant was never employed, Plaintiff prepared and provided to Defendant Goldston fully reconciled financial accounts, using Quickbooks, for each of Legacy Complete's bank accounts, and delivered the reconciled accounts to Defendant Goldston monthly and annually. In addition, Plaintiff provided to Defendant Goldston

the ledger that Plaintiff kept of expenses Plaintiff paid from her personal bank accounts on Legacy Complete's behalf.

42. Owner Hamilton had full access to each of Legacy Complete's bank accounts and Defendant Goldston had the ability to independently audit Legacy Complete's financial accounts.

43. Plaintiff had the opportunity to observe the interactions between Owner Hamilton and Defendant Goldston while Owner Hamilton's wife was alive and after Owner Hamilton's wife's passed away. After Owner Hamilton's wife died, Plaintiff noticed five types of concerning behaviors:

    a. It appeared that Defendant Goldston ignored Owner Hamilton's desires in favor of Defendant Goldston's own wishes,

    b. It appeared as if Defendant Goldston wanted Owner Hamilton to become dependent on Defendant Goldston,

    c. It appeared as if Defendant Goldston wanted control over Owner Hamilton's finances and memorabilia, during and after his life,

    d. It appeared as if Defendant Goldston wanted to surround Owner Hamilton with only the people she selected,

    e. It appeared as if Defendant Goldston was willing to cause the loss of Owner Hamilton's investment in Legacy Complete to further Defendant Goldston's own interests.

44. Plaintiff discussed her concerns with Defendant Goldston and Owner Hamilton together. Plaintiff emphatically requested that Owner Hamilton have an attorney work along side of Defendant Goldston.

45. The relationship between Defendant Goldston and Plaintiff became more contentious. Defendant Goldston refused to take required action with respect to Legacy Complete, knowing that refusing to take action would jeopardize the future of Legacy Complete.

46. Because of Defendant Goldston's actions/inactions, Plaintiff requested that Owner Hamilton's ownership share be converted to a loan. Converting his ownership share to a loan would give LegacyComplete the ability to raise much-needed capital.

47. In addition, Plaintiff insisted that Owner Hamilton hire an attorney to work on Owner Hamilton's behalf.

48. Owner Hamilton expressed to Plaintiff that he, Owner Hamilton, wanted Plaintiff to keep the money he invested and pay it forward after Legacy Complete was a success. Plaintiff responded that she refused to take $25,000 as a gift, and she definitely could not and would not convert the $125,000 in capital to a gift.

49. When Plaintiff continued to refuse to accept the capital as a gift, Owner Hamilton agreed that his ownership interest could either be converted into a loan or Plaintiff could find someone to buy Owner Hamilton's share. Owner Hamilton left the choice to Plaintiff. Plaintiff requested that they move forward converting Owner Hamilton's ownership into debt.

50. In approximately August 2015, Defendant Goldston and/or Owner Hamilton hired Defendant Montgomery to be Owner Hamilton's attorney. Defendant Montgomery is a partner at James D. Montgomery & Associates, Ltd ("Defendant Montgomery Law").

51. Plaintiff and Defendant Montgomery went to the same law school and were in the same graduating class. Although they knew of each other, they never had any significant interaction prior to this representation.

52. During one of their first communications, Plaintiff shared with Defendant Montgomery that Plaintiff was concerned about Defendant Goldston's interactions with Owner Hamilton and asked Defendant Montgomery to observe their interactions and take any necessary actions.

53. Defendant Montgomery replied that she was not concerned about their interactions and that she was hired to clean up the mess Plaintiff had created.

54. Plaintiff inquired to which mess Defendant Montgomery was referring. Plaintiff expressed to Defendant Montgomery that if Defendant Montgomery thought Plaintiff acted unethically in any way, Defendant Montgomery was obligated to submit a complaint to the Illinois Attorney Review and Discipline Commission ("ARDC"). Defendant Montgomery responded that she is on the ARDC, and she knows her obligations.

55. Defendant Montgomery did not file an ARDC complaint. However, Plaintiff filed an ARDC complaint requesting that both Plaintiff's actions and Defendant Montgomery's actions be reviewed by the ARDC. The ARDC "determined not to initiate an

investigation" with respect to Plaintiff's conduct. (EXHIBIT 1). The review has not concluded with respect to Defendant Montgomery.

56. In August 2015, Plaintiff sent an initial draft of the proposed ownership conversion documents to Defendant Montgomery. Defendant Montgomery responded. There were several iterations of edits and it seemed as if the parties were close to reaching an agreement in October 2015.

57. Defendant Montgomery included a provision in a draft of the conversion documents which Defendant Montgomery and Plaintiff disagreed on its interpretation.

58. While on a call, Defendant Montgomery emphatically insisted that Plaintiff was misinterpreting the provision. Plaintiff read the provision aloud. As Plaintiff read the provision, Defendant Montgomery snapped at Plaintiff stating that Defendant Montgomery could read and did not need the provision read to her. Plaintiff apologized and shared with Defendant Montgomery that Plaintiff has a learning disability and sometimes needs to read provisions aloud. Attorney Montgomery responded, "Oh, I didn't know you were stupid." Attorney Montgomery later sent an email obfuscating her "stupid" comment. (EXHIBIT 2)

59. By December 2015, it was clear that Plaintiff and Defendant Montgomery were not going to reach an agreement. Defendant Montgomery offered to keep the status quo.

60. In addition, in December 2015, it became clear that the first software developer that Legacy Complete hired would not complete the software as contracted. Legacy Complete had paid the developer $30,000 and worked with the contractor several months prior to the developer breaching its contract. The breach by the first developer

significantly impacted Legacy Complete's timeline to launch and significantly depleted its capital.

61. Plaintiff selected a second software developer, Bellwether Creation Company ("Bellwether"), which company began working to complete the software in January 2016. Legacy Complete tried to launch the patched software in or about March 2016. However, the patched software was so flawed that the attempted launch was scraped.

62. Plaintiff continued to try to raise capital for Legacy Complete. In 2016, Plaintiff repeatedly sent the attached proposed conversion documents to Defendant Montgomery. (EXHIBIT 3). In addition, Plaintiff held an emergency meeting and identified the options available to Legacy Complete to raise capital. (EXHIBIT 4) Defendant Montgomery refused to move forward with any of the options. (EXHIBIT 5). Legacy Complete ran out of operating capital.

63. To avoid a full shutdown, Plaintiff created a joint venture between Legacy Complete and Bellwether to complete the software. Plaintiff worked, without compensation, for 70-80 hours a week for nearly a year, to help Bellwether complete Legacy Complete's software.

64. Plaintiff received net compensation from Legacy Complete and the joint venture of approximately $11,000 (eleven thousand dollars) for working full-time for nearly two years.

65. Due to not receiving the compensation promised by Legacy Complete, Plaintiff was forced to sell her home of 15 years.

66. Legacy Complete was vulnerable because it had no capital. Exploiting that vulnerability, Bellwether kept Legacy Complete's software for itself in approximately August 2016.

67. Plaintiff brought a lawsuit against Bellwether for unjust enrichment for her uncompensated work (Brown v. Bellwether, et al, Cook County, Illinois, Circuit Court, 2017L000203) (EXHIBIT 6). Plaintiff was awarded a judgement of more than $400,000 against Bellwether by the court. However, Plaintiff has not been able to collect any of the judgement as Bellwether has been dissolved.

68. Because of the actions of Defendants and their agents, Plaintiff is currently unemployed and unable to earn a living.

## CLAIM ONE

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP

69. Plaintiff re-alleges the allegations set forth herein and incorporates the same by reference.

70. Defendants knew that Plaintiff was due compensation from Legacy Complete.

71. Defendants knew that Legacy Complete would be unable to perform its compensation obligation to Plaintiff if Owner Hamilton did not perform the obligations under Legacy Complete's operating agreement.

72. Based on information and belief, Defendants advised Owner Hamilton to ignore his obligations to Legacy Complete which caused Legacy Complete to default on its obligations to Plaintiff.

73. Plaintiff has experienced extreme financial hardship due to her compensation not being paid by Legacy Complete.

74. The actions of Defendants are the actual & proximate cause of harm to Plaintiff.

75. Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages. Defendants and Corporate Defendants are also liable to Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## CLAIM TWO

## DEFAMATION

76. Plaintiff re-alleges the allegations set forth herein and incorporates the same by reference.

77. Based on information and belief, beginning in 2015 and continuing to present day, the Defendants have made false statements about Plaintiff purporting those false statements to be fact. Those false statements include, but are not limited to, stating that Plaintiff took advantage of an elderly client and manipulated him to invest in her business.

78. Based on information and belief, Defendants and/or agents working on behalf of Defendants ("Agents"), launched a disinformation campaign designed to destroy Plaintiff's reputation and to prevent Plaintiff from being able to earn a living ("Disinformation Campaign").

79. Based on information and belief, Plaintiff believes the Disinformation Campaign includes, but is not limited to, creating and circulating deep fake videos of Plaintiff.

80. Based on information and belief, Defendants and their Agents intentionally spread the Disinformation Campaign to incite vigilantes ("Vigilantes") to harass, harm and/or terrorize Plaintiff.

81. The false statements and Disinformation Campaign have destroyed Plaintiff's reputation and have caused Plaintiff extreme emotional distress.

82. The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

83. Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages. Defendants and Corporate Defendants are also liable to Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## CLAIM THREE

### INTRUSION ON SECLUSION

84. Plaintiff re-alleges the allegations set forth herein and incorporates the same by reference.

85. In 2018, Plaintiff left Chicago in an attempt to escape the Disinformation Campaign and build a new life.

86. Based on information and belief, Defendants and/or their Agents would converge on Plaintiff's location and spread the Disinformation Campaign. Defendants and/or their Agents made it impossible for Plaintiff to build new relationships, retain existing relationships or establish a new life.

87. Defendants' intrusions on Plaintiff's seclusion were in a manner that would be objectionable to a reasonable person.

88. The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

89. Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages. Defendants and Corporate Defendants are also liable to

Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## CLAIM FOUR

## FALSE LIGHT

90. Plaintiff re-alleges the allegations set forth herein and incorporates the same by reference.

91. Based on information and belief, Defendants publicly disclosed the information that Plaintiff's former client, a leader in the civil rights movement, invested $125,000 in Plaintiff's business. Defendants then used that information to paint Plaintiff in a false light in several ways, including but not limited to:

    a.  leading people to believe that Plaintiff acted unethically with Owner Hamilton,

    b.  leading people to believe that Plaintiff exerted influence over an elderly person to coerce a monetary investment,

    c.  leading people to believe that Plaintiff is deceitful,

    d.  leading people to believe that Plaintiff targets her client, and,

    e.  contacting some of Plaintiff's past clients to inquire into whether Plaintiff acted inappropriately with them.

92. Based on information and belief, Defendants' disclosures were made with malice and intentionally placed Plaintiff in a false light; and

93. The false light in which Plaintiff is painted would be highly offensive to a reasonable person.

94. The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

95. Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages. Defendants and Corporate Defendants are also liable to Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## CLAIM FIVE

### FRAUD IN CONNECTION TO COMPUTERS

96. Plaintiff re-alleges the allegations set forth herein and incorporates the same by reference.

97. Based on information and belief, beginning in 2016 and continuing to the present, Defendants and/or their Agents, knowingly, and with intent to defraud, repeatedly accessed Plaintiff's electronic devices without Plaintiff's authorization.

98. By means of such conduct, the intended fraud was furthered and objects of value have been obtained.

99. As a result of such conduct, Plaintiff's devices have been damaged and her data stolen, deleted or corrupted.

100. The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

101. Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages. Defendants and Corporate Defendants are also liable to Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## CLAIM SIX

## WIRETAPPING

102.    Plaintiff re-alleges the allegations set forth herein and incorporates the same by

reference.

103.    Based on information and belief, beginning in 2016 and continuing to the present,

Defendants and/or their Agents, have intentionally and repeatedly intercepted Plaintiff's

electronic communications without Plaintiff's authorization.

104.    Based on information and belief, Plaintiff's devices were forced to connect to private

closed internet networks through which Defendants and/or their Agents intercepted and

monitored Plaintiff's communications.

105.    Plaintiff lost significant amounts of data and suffered extreme emotional distress

because of the unauthorized interceptions.

106.    The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

107.    Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of

$1,389,000 in actual damages.  Defendants and Corporate Defendants are also liable to

Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees

and litigation-related costs.

## CLAIM SEVEN

## OBSTRUCTION OF JUSTICE

108.    Plaintiff re-alleges the allegations set forth herein and incorporates the same by

reference.

109.   Based on information and belief, beginning in 2016 and continuing to the present, Defendants or their Agents, intentionally and repeatedly deleted data from Plaintiff's devices which included evidence relevant to judicial proceedings in Cook County, Illinois and Wake County, North Carolina.

110.   Based on information and belief, Defendants were aware of the proceedings.

111.   Based on information and belief, Plaintiff believes Defendants had corrupt intent to interfere with the proceedings.

112.   The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

113.   Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages. Defendants and Corporate Defendants are also liable to Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## CLAIM EIGHT

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

114.   Plaintiff re-alleges the allegations set forth herein and incorporates the same by reference.

115.   Based on information and belief, Defendants knew that the actions they took would cause Plaintiff to have extreme emotional distress.

116.   Based on information and belief, Defendants' conduct was intentional, extreme and outrageous.

117. Based on information and belief, Plaintiff has suffered, and continues to suffer, extreme emotional distress because of Defendants' conduct.

118. The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

119. Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages. Defendants and Corporate Defendants are also liable to Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## CLAIM NINE

## HOSTILE WORK ENVIRONMENT

120. Plaintiff re-alleges the allegations set forth herein and incorporates the same by reference.

121. Based on information and belief, Plaintiff was discriminated against based on her learning disability.

122. Based on information and belief, Plaintiff was subjected to an intimidating environment created by Defendant Montgomery and Defendant Goldston who were agents of Owner Hamilton.

123. Based on information and belief, Plaintiff was subjected to offensive behavior including, but not limited to, being referred to more than once as "stupid."

124. Moreover, Plaintiff was forced to work extremely long hours without compensation.

125. Plaintiff suffered extreme mental and emotional abuse because of the hostile environment.

126.    The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

127.    Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of
        $1,389,000 in actual damages.  Defendants and Corporate Defendants are also liable to
        Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees
        and litigation-related costs.


### CLAIM TEN

### PUBLIC DISCLOSURE OF PRIVATE FACTS

128.    Plaintiff re-alleges the allegations set forth herein and incorporates the same by
        reference.

129.    Based on information and belief, Plaintiff believes that Defendants or their Agents
        publicized a private fact regarding the private life of Plaintiff which fact they acquired
        from accessing files on Plaintiff's phone.

130.    The private fact is that Plaimtiff's genitals were disfigured during childhood.  This is
        visible in a photo which was taken during a medical consultation.  The photo was stored
        on Plaintiff's phone.

131.    Based on information and belief, the Defendants or their Agents acquired the photo
        when they breached Plaintiff's phone.

132.    Based on information and belief, Defendants and their Agents circulated the photo
        without Plaintiff's permission in an effort to further humiliate Plaintiff.

133.    The private fact was not newsworthy and was not a legitimate public matter.

134.    Publicizing that particular private fact would be highly offensive to a reasonable person.

135.    Plaintiffs suffered extreme emotional distress.

136.    The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

137.    Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages.  Defendants and Corporate Defendants are also liable to Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.


### CLAIM ELEVEN

### COPYRIGHT INFRINGEMENT

138.    Plaintiff re-alleges the allegations set forth herein and incorporates the same by reference.

139.    Plaintiff owns the copyright to the photo referenced in Claim Ten which photo was stored on Plaintiff's phone.

140.    Based on information and belief, Defendants did not have the rights necessary to distribute the photo and their distribution violated the Copyright Act.

141.    Having violated Plaintiff's rights, Plaintiff is entitled to statutory damages provided by the Copyright Act.

142.    Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages.  Defendants and Corporate Defendants are also liable to

Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## CLAIM TWELVE

## CIVIL CONSPIRACY

143. Plaintiff re-alleges the allegations set forth herein and incorporates the same by reference.

144. Based on information and belief, Defendants made an agreement to perform the overt acts referenced in the Claims herein in pursuance of a conspiracy.

145. Based on information and belief, Defendants and their Agents performed the agreed upon overt acts.

146. Based on information and belief, Plaintiff believes the Defendants, their Agents and/or the Vigilantes have been responsible for the following acts, including, but not limited to:

   a. Plaintiff has received death threats and numerous attempts to harm her;

   b. Plaintiff has had a gun pulled on her;

   c. Plaintiff has been pushed into moving traffic;

   d. Plaintiff has been threatened by police officers;

   e. Plaintiff has had police officers storm into her hotel room while Plaintiff was partially naked, then she was forced to her car;

   f. Plaintiff's devices have been repeatedly hacked and Plaintiff's files have been deleted or altered;

g.  Plaintiff's calls and emails have been repeatedly routed away from Plaintiff;

h.  Plaintiff's email addresses and phone numbers have been hacked and used to impersonate Plaintiff;

i.  Plaintiff's online appointments and contact book information have been changed and deleted;

j.  Plaintiff's temporary places of residence have been burglarized;

k.  Plaintiff's vehicle has been tampered with;

l.  Plaintiff has been confronted by groups of individuals whom she did not know, including but not limited to, Alabama, Georgia, North Carolina and Illinois.  In addition, angry individuals accused Plaintiff of having stolen money from an elderly civil rights leader.

147.  Plaintiff suffered damages as a result of the acts Defendants, and their Agents, performed in furtherance of the conspiracy.

148.  The actions of the Defendants are the actual & proximate cause of harm to Plaintiff.

149.  Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages.  Defendants and Corporate Defendants are also liable to Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## CLAIM THIRTEEN

## VICARIOUS LIABILITY

150.    Plaintiff re-alleges the allegations set forth herein and incorporates the same by

reference.

151.    Based on information and belief, several of the Defendants' overt acts occurred

within locations operated by Defendant JP Morgan and were committed by agents of

Defendant JP Morgan who were acting within their agency responsibilities.

152.    Since the agents of Defendant JP Morgan were operating within the scope of their

duties, Defendant JP Morgan is vicariously liable for the acts of its agents.

153.    Based on information and belief, several of the overt acts occurred within locations

operated by Defendant Montgomery Law and were committed by an agent of Defendant

Montgomery Law who was acting within her agency responsibilities.

154.    Since the agent of Defendant Montgomery Law was operating within the scope of her

duties, Defendant Montgomery Law is vicariously liable for the acts of its agent.

155.    Based on information and belief, Defendants and their Agents launched a

Disinformation Campaign designed to recruit Vigilantes to target, harass and terrorize

Plaintiff.

156.    Based on information and belief, the Vigilantes and Agents were incited by the

Disinformation Campaign, called to action by the Defendants and acted on the

Defendants' behalf.  Therefore, the Defendants and the Corporate Defendants are

vicariously liable for the actions of the Agents and Vigilantes.

157.    Accordingly, Defendants and Corporate Defendants are liable to Plaintiff in excess of $1,389,000 in actual damages. Defendants and Corporate Defendants are also liable to Plaintiff for statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs.

## PRAYER FOR RELIEF

## ACTUAL, STATUTORY, PUNITIVE AND EXEMPLARY DAMAGES

158.    Plaintiff respectfully submits that Defendants and Corporate Defendants are liable to Plaintiff for actual, statutory, compensatory, punitive and exemplary damages, attorneys' fees and litigation-related costs as set forth herein.

159.    Plaintiff respectfully requests her actual damages which Plaintiff will prove at trial and Plaintiff estimates as $1,389,000.

160.    Plaintiff respectfully requests the statutory amount of damages for violating Plaintiff's copyright as set forth in Claim Eleven.

161.    Plaintiff respectfully requests compensatory, punitive and exemplary damages commensurate with the severity of Defendants' actions in an amount of no less than $50,000,000.

162.    Plaintiff respectfully requests an amount equal to Plaintiff's attorney's fees and litigation-related costs.

## CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my
knowledge, information and belief that this complaint:

(1) is not being presented for an improper purpose, such as to harass, cause unnecessary

delay, or needlessly increase the cost of litigation;

(2) is supported by existing law or by a non-frivolous argument for extending, modifying,

or reversing existing law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will

likely have evidentiary support after a reasonable opportunity for further investigation or

discovery; and

(4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers

may be served. I understand that my failure to keep a current address on file with the Clerk's

Office may result in the dismissal of my case.

_____ on this August 20, 2020

Kimberly Jean Brown,

Pro Se Plaintiff

1026 E. 46th St, Unit 2E

Chicago, IL 60653

(773) 673-0324

Kim@NotByLuck.net

**EXHIBITS**

Exhibit 1:  Letter from ARDC

Exhibit 2:  Screenshot of "Stupid" comment

Exhibit 3:  Draft of proposed loan documents

Exhibit 4:  Emergency Meeting Minutes

Exhibit 5:  Letter from Attorney Montgomery May 6 2016

Exhibit 6:  Complaint against web developer

# EXHIBIT 1



**ATTORNEY REGISTRATION AND DISCIPLINARY COMMISSION**
of the
**SUPREME COURT OF ILLINOIS**

One Prudential Plaza
130 East Randolph Drive, Suite 1500
Chicago, Illinois 60601-6219
(312) 565-2600 (800) 826-8625
Fax (312) 565-2320

3161 West White Oaks Drive, Suite 301
Springfield, IL 62704
(217) 546-3523 (800) 252-8048
Fax (217) 546-3785

Kimberly Brown
Kjb213@icloud.com

Chicago
May 27, 2020

Re:     Kimberly Brown
        No. 2020IN01537

Dear Ms. Brown:

We have received your request for an investigation of "Michelle Montgomery, et al," in which you also request that the ARDC review your actions and "determine that [you] behaved appropriately."

Michelle Montgomery serves as a volunteer member of this Commission's Inquiry Board. Accordingly, your request for an investigation of Ms. Montgomery has been referred to independent Special Counsel Robert P. Marcus for review. If he has not done so already, Mr. Marcus will be communicating with you directly with respect to his review of your claims regarding Mr. Montgomery.

Based on the information and documents provided in your request, we have determined not to initiate an investigation with respect to your conduct at this time. Please understand that the ARDC does not issue advisory opinions regarding the propriety of attorney conduct. Our decisions not to initiate investigations are not necessarily determinations that attorney conduct was appropriate and should not be taken as such.

Commission Rule 54 permits the ARDC to reopen closed investigative files where circumstances warrant. Additionally, our file in this matter is private and confidential under Illinois Supreme Court Rule 766.

Very truly yours,

/s/Althea K. Welsh
Deputy Administrator, Intake
  and Administration

AKW:ck
MAINLIB_#12n5906_v1

EXHIBIT 2

7:48 AM Fri Feb 28  21%

Done ≡  **Exchange 08.08.16 - 9pgs - requesting additional financials & P and L....**  Ⓐ  ⬆

LegacyComplete.com Mail - RE: FW: Legacy Com...          https://mail.google.com/mail/u/0/?ni=2&ik=f0a0...

Kimberly Jean Brown, Esq., Manager
LegacyComplete.com
(773) 249-4400 x 700 or schedule a call

**Join me for a webinar:**
1) Learn how we can streamline your law practice: Attorney Intro
2) Hit the ground running: Attorney Quick Start
3) Maximize your use: Training Tuesdays
4) Brainstorm new ideas & uses: Cool Ideas Fridays

LEGACY

  

[Quoted text hidden]

─────────────────────────────────────

mmm <mmm@jdmlaw.com>.                                    Mon, Aug 8, 2016 at 9:12 PM
To: Kimberly Brown <kimberly@legacycomplete.com>
Cc: "cv.hamilton@comcast.net" <cv.hamilton@comcast.net>, "lilagoldston@yahoo.com"
<lilagoldston@yahoo.com>

Kim,

I know better than to believe you are as naïve or dumb or "I have a reading disorder"
as you pretend to be. If your (in)actions weren't so serious, I would encourage you to
start doing comedy because your emails are beginning to border on the hilarious.

Good night to you . . .

M

**From:** Kimberly Brown [mailto:kimberly@legacycomplete.com]
**Sent:** Monday, August 08, 2016 8:38 PM
**To:** mmm <mmm@jdmlaw.com>
**Cc:** cv.hamilton@comcast.net
**Subject:** Re: FW: Legacy Complete LLC: 2015 Financials and Sale of CVH Interest

EXHIBIT 3 - DOCUMENT 1

# PROMISSORY NOTE

**$125,000.00   Date: April 18, 2016**

For value received, the undersigned, Kimberly J. Brown, Manager of The Brown Washington LLC, a Michigan Limited Liability Company (the "Borrower") of 4630 S. Greenwood Ave, Chicago, Illinois 60653, promises to pay to the order of the Charles V. Hamilton Living Trust dated December 5, 2014, and restated July 17, 2015 (the "Lender"), of 5201 S. Cornell Ave, Unit 28D, Chicago, Illinois 60615 (or at such other place as the Lender may designate in writing), the sum of $125,000.00 with interest from May 1, 2015, on the unpaid principal at the rate of nine percent (9%) per annum.

## I. TERMS OF REPAYMENT

### A. Payments

The unpaid principal and accrued interest shall be payable in monthly installments of $15,000.00, beginning on April 18, 2017, and continuing until June 5, 2019, (the "Due Date"), or such earlier date when the unpaid principal and any accrued interest has been paid in full.

### B. Application of Payments

All payments on this Note shall be applied first in payment of accrued interest and any remainder in payment of principal.

### C. Acceleration of Debt

If any payment obligation under this Note is not paid when due, the remaining unpaid principal balance and any accrued interest shall become due immediately at the option of the Lender.

## II. PREPAYMENT

The Borrower reserves the right to prepay this Note (in whole or in part) prior to the Due Date with no prepayment penalty. Any such prepayment shall be applied against the installments of principal due under this note in the inverse order of their maturity and shall be accompanied by payment of accrued interest on the amount prepaid to the date of prepayment.

## III. COLLECTION COSTS

*Promissory Note*                                                                                    *Initials:_____*

If any payment obligation under this Note is not paid when due, the Borrower promises to pay all reasonable costs of collection, including reasonable attorney fees, whether or not a lawsuit is commenced, as part of the collection process.

## IV. DEFAULT

If any of the following events of default occur, this Note and any other obligations of the Borrower to the Lender, shall become due immediately, without demand or notice:

1) the failure of the Borrower to pay the principal and any accrued interest when due;

2) the liquidation, dissolution, incompetency or death of the Borrower;

3) the filing of bankruptcy proceedings involving the Borrower as a debtor;

4) the application for the appointment of a receiver for the Borrower;

5) the making of a general assignment for the benefit of the Borrower's creditors;

6) the insolvency of the Borrower;

7) a misrepresentation by the Borrower to the Lender for the purpose of obtaining or extending credit; or

8) the sale of a material portion of the business or assets of the Borrower.

## V. SEVERABILITY OF PROVISIONS

If any one or more of the provisions of this Note are determined to be unenforceable, in whole or in part, for any reason, the remaining provisions shall remain fully operative.

## VI. NOTICES

All notices required under or in connection with this note shall be hand-delivered by messenger, or placed in overnight mail, with trackable delivery, to the addresses set forth in the preamble hereof, or to such other address as any party may designate from time to time by notice to the others in the manner set forth herein. All notices shall be deemed to have been given or made at the time of delivery thereof.

*Promissory Note*                                                    *Initials: _____*

## VII. NO PARTNERSHIP OR JOINT VENTURE

Nothing contained in this note or elsewhere shall be construed as creating a partnership or joint venture between Lender and Borrower or between Lender and any other person or as causing the holder of the note to be responsible in any way for the debts or obligations of Borrower or any other person.

## VIII. HEADINGS

Headings at the beginning of each numbered paragraph of this note are intended solely for convenience of reference and are not to be construed as being a part of the note.

## IX. TIME OF ESSENCE

Time is of the essence with respect to every provision of this note.

## X. MISCELLANEOUS

All payments of principal and interest on this Note shall be paid in the legal currency of the United States.

No delay in enforcing any right of the Lender under this Note, or assignment by Lender of this Note, or failure to accelerate the debt evidenced hereby by reason of default in the payment of a monthly installment or the acceptance of a past-due installment shall be construed as a waiver of the right of Lender to thereafter insist upon strict compliance with the terms of this Note without notice being given to Borrower. All rights of the Lender under this Note are cumulative and may be exercised concurrently or consecutively at the Lender's option.

This Note may not be amended without the written approval of the Note's holder or the Borrower.

## XI. ASSIGNMENT

Borrower acknowledges that this Note may be assigned or transferred to one of the IRS 501(c) (3) organizations listed on Exhibit A attached ("Permissible Assignee"). Borrower agrees that, if this Note is assigned or transferred to a Permissible Assignee, the rights and benefits hereof shall be fully exercisable by said Permissible Assignee and that the assignment to the Permissible Assignee shall not invalidate or diminish Borrower's duties and obligations hereunder.

## XII. GOVERNING LAW

This Note shall be construed in accordance with the laws of the State of Illinois.

## XIII. SIGNATURES

This Note shall be signed by Kimberly J. Brown, manager of The Brown Washington LLC.

### [SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF,** this Agreement has been executed and delivered in the manner prescribed by law as of the date first written above.

Signed this ___th day of April 2016.

Borrower:
Kimberly J. Brown

By:_____

      Kimberly J. Brown, Manager
      The Brown Washington LLC

**STATE OF ILLINOIS**
**COUNTY OF COOK**

The foregoing instrument was acknowledged before me this ___th day of April 2016 by Kimberly J. Brown, who has produced her driver's license as identification.


                        _____

                        Notary Public
                        Print Name: _____
(Seal)             My Commission Expires:

*Promissory Note*                         *Initials:* _____

## EXHIBIT A
### To the Note dated April 18, 2016 from the Brown Washington LLC
### to the Charles V. Hamilton Living Trust dated December 5, 2014, restated July 17, 2015

The following three IRS 501(c)(3) charitable organizations have been designated by Charles V. Hamilton and are permitted as an assignee of the Note and Guaranty dated April 18, 2016 ("Permissible Assignee"). This Exhibit A must be signed and notarized to be valid.

1) Name of Organization:_____

   Address of Organization:_____

   _____

2) Name of Organization:_____

   Address of Organization:_____

   _____

3) Name of Organization:_____

   Address of Organization:_____

   _____

I agree to these Permissible Assignees: _____

Kimberly Jean Brown, Manager of Brown Washington LLC

STATE OF ILLINOIS
COUNTY OF COOK

The foregoing instrument was acknowledged before me this ____ th day of April 2016 by Kimberly J. Brown, who has produced her driver's license as identification.

_____
Notary Public
Print Name: _____
(Seal)                    My Commission Expires: _____

*Promissory Note*                                               *Initials:_____*

EXHIBIT 5 - DOCUMENT 2

## LOAN GUARANTY

THIS GUARANTY, is made this April 18, 2016, by Kimberly J. Brown of 4630 S. Greenwood Ave., Chicago, IL 60653 (the "Guarantor"), to the Charles V. Hamilton Living Trust dated December 5, 2014, restated July 17, 2015, of 5201 S. Cornell Ave., Unit 28D, Chicago, IL 60615 (the "Lender").

WHEREAS Lender is the owner and holder of that certain Promissory Note (the "Note") dated April 18, 2016 in the original principal amount of $125,000 executed by The Brown Washington LLC, a Michigan limited liability company, (the "Borrower"); and

WHEREAS Guarantor is the manager of Borrower; and

WHEREAS to induce Lender to enter into the loan transaction evidenced by the Note (the "Loan"), Guarantor has agreed to guaranty the obligations of Borrower; and

WHEREAS Lender is unwilling to enter into the Loan unless Guarantor guarantees the payment thereof;

NOW THEREFORE, as a material inducement to Lender to enter into the Loan, Guarantor agrees with Lender as follows:

1.      The above recital are true and correct and are incorporated herein.

2.      To induce Lender to enter into the Loan, Guarantor unconditionally guarantees and promises to pay to Lender, upon a default of the Loan as defined in Article IV of the Note, any and all indebtedness of Borrower to Lender associated with the Loan in lawful money of the United States.

3.      Upon default of the Loan as defined in Article IV of the Note, a separate action may be brought and be prosecuted against Guarantor whether action is brought against Borrower or whether Borrower be joined in any such action or actions; and Guarantor waives the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. The obligations of Guarantor hereunder are independent of the obligations of Borrower.

4.      Intentionally Omitted.

5.      Upon default of the Loan, Guarantor waives any right to require Lender to (a) proceed against Borrower; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in Lender's power whatsoever.

6.      Intentionally Omitted.

7.      Guarantor acknowledges that the Loan herein guaranteed may be assigned or transferred to any one of the agreed upon 501(c)(3) organizations listed on the attached Exhibit A

GUARANTY                                                                Initials: .... ____

("Permissible Assignee"). Exhibit A must be signed and notarized by Guarantor to be valid. Guarantor agrees that, once the loan has been assigned or transferred to a Permissible Assignee, the rights and benefits hereof shall be fully exercisable by said Permissible Assignee and that no assignment or transfer to a Permissible Assignee shall invalidate or diminish Guarantor's duties and obligations hereunder.

      8.    Upon default of the Loan as defined in Article IV of the Note, Guarantor agrees to pay reasonable attorney's fees, costs and expenses which may be incurred by Lender or by a Permissible Assignee to whom the Loan has been assigned or transferred, in the enforcement of this Guaranty.

      9.    This Guaranty shall be interpreted, construed and enforced according to the laws of the State of Illinois.

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty the day and year first above written.

_____
Guarantor
Kimberly J. Brown, signing individually

**STATE OF ILLINOIS**
**COUNTY OF COOK**
The foregoing instrument was acknowledged before me this ____th day of April 2016 by Kimberly J. Brown, who has produced her driver's license as identification.

_____
Notary Public
Print Name: _____
(Seal)        My Commission Expires:

## EXHIBIT A
### to the Guaranty dated April 18, 2016 from Kimberly J. Brown
### to the Charles V. Hamilton Living Trust dated December 5, 2014, restated July 17, 2015

The following IRS 501(c)(3) charitable organizations have been designated by Charles V. Hamilton and are permitted as an assignee of the Note and Guaranty ("Permissible Assignee"). This Exhibit A must be signed and notarized to be valid.

1) Name of Organization:_____

   Address of Organization:_____

   _____

2) Name of Organization:_____

   Address of Organization:_____

   _____

3) Name of Organization:_____

   Address of Organization:_____

   _____

I agree to these Permissible Assignees: _____
                                         Kimberly Jean Brown, signing individually

STATE OF ILLINOIS
COUNTY OF COOK

The foregoing instrument was acknowledged before me this ____th day of April 2016 by Kimberly J. Brown, who has produced her driver's license as identification.

                                    _____
                                    Notary Public
                                    Print Name: _____
(Seal)                              My Commission Expires:

**GUARANTY**                                                    Initials: _____

EXHIBIT 5 - DOCUMENT 3

State of Illinois ) $125,000
County of Cook ) April 18, 2016

### Bill of Sale

**FOR AND IN CONSIDERATION OF** the sum of $125,000.00 U.S. Dollars, inclusive with all sales tax, paid by Promissory Note, the receipt of which is hereby acknowledged, the Charles V. Hamilton Living Trust dated December 5, 2014 as restated on July 17, 2105 (the "Seller") of 5201 S. Cornell Ave Unit 28D, Chicago, Illinois 60615 **DOES HEREBY SELL, ASSIGN, AND TRANSFER** to Kimberly J. Brown, Manager of the Brown Washington LLC, a Michigan Limited Liability Company (the "Buyer") of 4630 S. Greenwood Ave, Chicago, Illinois 60653, the following described property (the "Property"):

**Seller's ownership in Legacy Complete LLC, a Nevada limited liability company, and/or in any other related entities**

The Property is being sold on an "AS IS" basis and the Seller explicitly disclaims all warranties, whether expressed or implied, including but not limited to, any warranty as to the condition of the Property.

The Buyer has accepted the Property in its existing condition.

Seller represents and warrants that Seller is the lawful owner of the Property and that the Property transferred hereunder is free and clear of all mortgages, liens or encumbrances of any nature whatsoever, and that Seller shall indemnify, defend and hold Buyer harmless against such claims and demands.

In the event any dispute between the parties hereto should result in litigation or arbitration, the prevailing party shall be reimbursed for all reasonable costs in connection therewith, including, but not limited to, reasonable attorney's fees and defense costs. In no event shall either party be liable for incidental, consequential, indirect or special damages of any kind, including but not limited to loss of profit.

The terms of this Bill of Sale shall bind and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

The parties hereby agree to execute such other documents and perform such other acts as may be necessary or desirable to carry out the purposes of this Bill of Sale.

This Bill of Sale shall be signed by the Buyer's Representative and by the Seller, and shall be effective as of April 18, 2016.

Bill of Sale                                                                 Initials:_____   _____

IN WITNESS WHEREOF, Charles V. Hamilton has executed this Bill of Sale on:

By: _____  Date: _____

Charles V. Hamilton, Trustee of the
Charles V. Hamilton Living Trust dated
December 5, 2014, restated July 17, 2016
5201 S. Cornell Ave Unit 28D
Chicago, Illinois 60615

**STATE OF ILLINOIS**
**COUNTY OF COOK**

The foregoing instrument was acknowledged before me this _____ day of _____ 2016 by Charles V. Hamilton, who has produced his driver's license as identification.

_____
Notary Public
Print Name: _____

(Seal)              My Commission Expires:

IN WITNESS WHEREOF, Kimberly J. Brown has executed this Bill of Sale on:

By: _____  Date: _____

Kimberly J. Brown, manager of
The Brown Washington LLC, a Michigan Limited Liability
4630 S. Greenwood Ave
Chicago, Illinois 60653

**STATE OF ILLINOIS**
**COUNTY OF COOK**

The foregoing instrument was acknowledged before me this ____ th day of April 2016 by Kimberly J. Brown, who has produced her driver's license as identification.

_____
Notary Public
Print Name: _____

(Seal)              My Commission Expires:

Bill of Sale

EXHIBIT 3 - DOCUMENT 4

## RESOLUTION NO. 2016 – 1

## RESOLUTION OF LEGACY COMPLETE LLC, A NEVADA LIMITED LIABILITY CORPORATION AUTHORIZING THE TRANSFER OF THE MEMBERSHIP INTEREST OWNED BY THE CHARLES V. HAMILTON LIVING TRUST DATED DECEMBER 5, 2014 AND RESTATED ON JULY 17, 2015.

BE IT RESOLVED by the Manager of Legacy Complete LLC (the "Company") as follows:


Section 1.     The Manager of Company find and determine:


A.     Approval of the transfer of the membership interest owned by the Charles V. Hamilton Living Trust dated December 5, 2014, restated July 17, 2015, which constitutes 25% of the membership interest of Legacy Complete LLC, for a value of $125,000, to the Brown Washington LLC, a Michigan Limited Liability Company.


Section 2.     The Manager is authorized by the Operating Agreement dated June 5, 2015, to execute these resolutions.


Section 3.     These resolutions are effective upon written approval by Charles V. Hamilton.


Adopted this April 18, 2016.


LEGACY COMPLETE LLC, a Nevada limited liability company


By:     Kimberly J. Brown
Its:     Manager

I approve RESOLUTION NO. 2016-I authorizing the transfer of the membership interest owned by the Charles V. Hamilton Living Trust dated December 5, 2014 and restated on July 17, 2015, to the Brown Washington LLC, a Michigan limited liability company.

_____
Charles V. Hamilton, Trustee
Charles V. Hamilton Living Trust

**STATE OF ILLINOIS**
**COUNTY OF COOK**

The foregoing instrument was acknowledged before me this ____ th day of April 2016 by Charles V. Hamilton, who has produced his driver's license as identification.

_____
Notary Public
Print Name: _____
(Seal)              My Commission Expires:

EXHIBIT 4

## Legacy Complete LLC
## Emergency Meeting Minutes May 2, 2016

I. **Emergency Meeting** - Notice of meeting emailed April 27, 2016.

II. **Attendance**
   A. Present: Kimberly Jean Brown, Manager of LegacyComplete and a Trustee of the BW Trust (75% member)
   B. Voting by email: Michelle Montgomery, attorney for the Charles Hamilton Living Trust (25% member). The questions posed in Items IV & V below are different from the question posed in the email. The votes posted are in the spirit of the email. Attorney Montgomery is requested to indicate if the votes should be changed to "not present" instead of "no."

III. **Manager's Report**

   A. **Our Financial Crisis**

      1. Due to the delay of the launch of the website, we have generated less than $4,000 in 2016. In addition, the site has not been available for new purchases for the last month as we have experienced significant technical issues when we launched in March. The web development team is currently re-working several systems which should be ready to re-launch May 15. We will be announcing a mother's day special this week to regain the momentum we lost during the last month.

      2. We owe our new web developer a significant amount of money. Our balance continues to grow as additional work is performed to make the website functional.

      3. Our monthly expenses in our 2016 forecast ranged from $10,000-$29,000, most of those are not being paid due to our lack of capital.

      4. I have received less than one month's pay in 2016. This has resulted in great financial hardship for me and my family. Nonetheless, being committed to the success of LegacyComplete, I have worked a minimum of 80-hours each week of 2016. In addition, I have used my limited funds to pay for some of LegacyComplete's expenses.

      5. If we don't embark on a plan to generate capital immediately, I will be forced to seek paid employment.

   B. **Options to raise more capital** - I have researched options available to expeditiously raise capital. I examine 5 options below.

      1. **Increase revenue** - this is the preferred option, however this requires an operable website and money to market it. Unfortunately, we do not have any resources to pay for marketing and the revisions to the website will likely not

be ready for re-release until May 15th. We will be launching a gift certificate program which will hopeful generate a couple thousand dollars which is a small fraction of the overall operating expenses. Thus, this option is unlikely to generate significant capital.

2. **Take out a loan** - I have researched this option extensively. However, lenders require that each member who has at least a 20% interest in LegacyComplete provide their financials and assume personal liability. Because it is unlikely that all Members would be willing to meet this requirement, this option is no longer being pursued.

3. **Capital call** - We could make a capital call of Members to contribute capital to LegacyComplete in proportion to their Membership interest. However, since it is unlikely that all Members could or would participate in the capital call, this option is untenable.

4. **Create a second company and have LegacyComplete as a member of the second LLC** - This could yield the necessary capital or services to help us thrive by selling interest in the second LLC to raise capital. This option may avoid having to amend our current Operating Agreement but may be more complex and more costly than the next option.

5. **Sell Membership interest** - This option can yield the necessary capital or services to help us thrive. We have received interest in this option from our web developer to satisfy our outstanding invoices. However, I cannot effectively or efficiently pursue this option without our LLC agreement being amended to allow additional Membership interest to be sold, without having to receive the consent of existing Members. **Since transferring/selling Membership interest will NOT adversely affect existing Members and can save LegacyComplete from financial collapse,** I believe this may be the best option to pursue.

IV. I propose the following amendment to the LegacyComplete Operating Agreement:

A. Add Section 4.9 to the Operating Agreement as follows: "Under financially urgent circumstances, the Manager shall have the power to amend this Operating Agreement to accommodate the immediate sale or transfer of Membership interest, without the consent of the Members, either to raise capital or in exchange for services rendered."

B. Vote to approve proposed language:
   1. BW Trust (75%): Yes
   2. Charles Hamilton Living Trust (25%): No

C. Amendment passed by a majority of the Members.

V. I call for a vote that based on the information herein, our current circumstances are "financially urgent".

A. Are our current financial circumstances "financially urgent" such that the amendment adopted in Item IV is active?
1. BW Trust (75%): Yes
2. Charles Hamilton Living Trust (25%): No

B. Passed by a majority of the Members. Our current circumstances are "financially urgent" and the amendment adopted in Item IV is active.

VI. Amend Operating Agreement to allow the transfer of the Charles Hamilton Living Trust Membership Interest.

A. The Charles Hamilton Living Trust wants to change its membership interest into a loan. The Operating Agreement does not currently provide for this, so I propose the following language be added to the Operating Agreement as Section 7.5: "If a Member desires to convert Membership Interest to a loan and another Member, or a related entity, is agreeable to completing said conversion, upon reaching mutually-agreed upon terms, the conversion of the Membership Interest to a loan does not need to be approved by the Members."

B. Vote to approve proposed language:
1. BW Trust (75%): Yes
2. Charles Hamilton Living Trust (25%): Not present

C. Amendment passed by a majority of the Members

VII. Meeting adjourned. Minutes emailed to Members for approval.



**James D. Montgomery**
**and Associates, Ltd.**

Law Offices

*Michelle M. Montgomery*
*Direct: (312) 726-4053*
*mmm@jdmlaw.com*

May 6, 2016

***VIA CERTIFIED MAIL & EMAIL***
Kimberly Brown
Legacy Complete LLC
4630 S. Greenwood
Chicago, IL 60653
Email: kimberly@legacycomplete.com

Re:     *Charles Hamilton $125,000 Investment into Legacy Complete LLC, a Nevada corporation ("Company"): Proposed Amendments to Operating Agreement*

Dear Kim,

Please find this letter in response to your email of May 3, 2016 with attached minutes of the Monday 2, 2016 meeting of the member of the Company ("Minutes"). On behalf of Dr. Hamilton, he reiterates as well as indicates that his votes to your proposed amendments to the Operating Agreement are categorically "NO" as previously set forth in my email of April 30, 2016. He has no objection to you indicating in the minutes that he nor I were present at the May 2, 2016 meeting; however, you should revise the minutes to indicate that his votes were lodged via my email of April 30, 2016.

Further, the Minutes also need to be revised to reflect the fact that the proposed amendments did not pass given that Dr. Hamilton voted "NO" and Section 8.1 of the Operating Agreement requires unanimous consent. Your inclusion in the Minutes of patently false information could be used by you to perpetrate a fraud on unsuspecting investors and lenders. As such, I am prepared to file the attached complaint for declaratory judgment to enjoin you from further illegal acts on behalf of the Company.

Very truly yours,
James D. Montgomery & Associates, Ltd.

Michelle M. Montgomery

Enclosure

cc:   Dr. Charles Hamilton

EXHIBIT 5 - DOCUMENT 2

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, CHANCERY DEPARTMENT

CHARLES V. HAMILTON, as Trustee
for THE CHARLES V. HAMILTON
LIVING TRUST,

             Plaintiff,

v.

KIMBERLY JEAN BROWN,
Individually, and as Trustee for THE
BW TRUST,

             Defendant.

No. 16 CH _____
Calendar __

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff CHARLES V. HAMILTON, as Trustee for the CHARLES V.
HAMILTON LIVING TRUST, by counsel JAMES D. MONTGOMERY & ASSOCIATES,
LTD., complains of Defendant KIMBERLY JEAN BROWN, Individually, and as
Trustee for the BW TRUST, as follows.

### COUNT ONE – DECLARATORY JUDGMENT

1.    Plaintiff Charles V. Hamilton is a resident of Cook County, Illinois.

2.    Defendant Kimberly Jean Brown is a resident of Cook County, Illinois.
She is sued in her individual capacity, and as Trustee for The BW Trust.

3.    Defendant is an attorney licensed to practice law in the State of
Illinois.

4.    Plaintiff, as Trustee for The Charles V. Hamilton Living Trust, and
defendant, as Trustee for The BW Trust, executed a Operating Agreement for
Legacy Complete LLC, a Nevada Limited Liability Company, in Chicago, Illinois, on

June 4, 2015 (hereafter, the "Operating Agreement"). A copy of the Operating Agreement is attached hereto as Exhibit A.

5.    Defendant served as plaintiff's estate-planning counsel prior to entering into the Operating Agreement with him.

6.    Defendant accepted $125,000.00 of plaintiff's funds as a purported investment in Legacy Complete LLC, a Nevada Limited Liability Company (hereafter, "Legacy Complete LLC").

7.    The members of Legacy Complete LLC are The Charles V. Hamilton Living Trust and The BW Trust.

8.    The extent of The Charles V. Hamilton Living Trust's ownership interest in Legacy Complete LLC is 25%.

9.    The extent of The BW Trust's ownership interest in Legacy Complete LLC is 75%.

10.    Defendant additionally serves as the Manager of Legacy Complete LLC.

11.    The Operating Agreement expressly provides that its terms cannot be amended or modified without the written consent of all members. In particular, section 8.1 of the Operating Agreement provides:

> 8.1 AMENDMENTS. Amendments to this Agreement may be proposed by any Member. A proposed amendment will be adopted and become effective as an amendment only on the written approval of all of the Members.

Ex. A at p.6.

12.  Notwithstanding this, defendant held an "Emergency Meeting" of Legacy Complete LLC on May 2, 2016, at her residence, with no one else present, where she purported to propose, pass, and ratify amendments to the Operating Agreement, despite Charles Hamilton Living Trust's affirmative "no" vote against the proposed amendments. A copy of the purported Minutes of the Legacy Complete LLC Emergency Meeting are attached hereto as Exhibit B.

13.  Specifically, during her meeting, defendant proposed and "passed" amendments that would enable her to "accommodate the immediate sale or transfer of Membership Interest, without the consent of the Members...." Ex. B. Such amendments would permit defendant to dilute plaintiff's investment and ownership interest in Legacy Complete LLC by issuing shares to third persons.

14.  Section 8.4 of the Operating Agreement contains an attorney fee provision, which provides in relevant part:

> ATTORNEY FEES: In the event of any suit or action to enforce or interpret any provision of this Agreement (or that is based on this Agreement), the prevailing party is entitled to recover, in addition to other costs, reasonable attorney fees in connection with the suit, action, or arbitration, and in any appeals.

Ex. A at p.7.

15.  On information and belief, defendant intends to proceed with the sale or transfer of Membership Interest in Legacy Complete LLC without plaintiff's consent. Plaintiff is accordingly in peril and in danger of loss unless this Court intervenes, construes the Operating Agreement according to its terms, and declares the purported amendments invalid.

3

16.     Under the Code of Civil Procedure, 735 ILCS 5/2-701 (West 2016), this Honorable Court is vested with the power to declare the rights and liabilities of the parties under the terms of the Operating Agreement, to adjudicate the final rights of the parties thereunder, and to give such other and further relief as may be necessary to enforce the same.

WHEREFORE, plaintiff Charles V. Hamilton, as Trustee for The Charles V. Hamilton Living Trust, asks for:

a) a declaratory judgment finding that defendant's proposed amendments to the Operating Agreement contained in Exhibit B are null and void;

b) a further declaratory finding that no amendments, modifications, or changes to the Operating Agreement shall be made without the written consent of plaintiff;

c) a further declaratory finding that any purported transfers or sales of any ownership interest in Legacy Complete LLC that were made without the written consent of plaintiff are null and void;

d) a money judgment in favor of plaintiff and against defendant for plaintiff's reasonable attorney fees in accordance with Section 8.4 of the Operating Agreement, plus the taxable costs of this action.

CHARLES V. HAMILTON, AS TRUSTEE
FOR THE CHARLES V. HAMILTON
LIVING TRUST

By:     _____
**MICHELLE M. MONTGOMERY**
JAMES D. MONTGOMERY & ASSOCIATES, LTD.
One North LaSalle Street, Suite 2450
Chicago, IL 60602
(312) 977-0200
Attorney No. 91165
Counsel for Plaintiff

4

EXHIBIT C

FILED ELECTRONICALLY FILED
2017-L-000203
CALENDAR: R
PAGE 1 of 13
CIRCUIT COURT OF
COOK COUNTY, ILLINOIS
LAW DIVISION
CLERK DOROTHY BROWN

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

| | | |
|---|---|---|
| KIMBERLY J. BROWN | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| Bellwether Creation Company, and | ) | |
| Michael Greeby, and, | ) | |
| Storm Vaske, and, | ) | |
| DOE 1 and, | ) | No: |
| DOE 2, and, | ) | |
| DOE 3, and, | ) | |
| DOE 4 | ) | DEMAND FOR JURY TRIAL |
| Defendants. | | |

## COMPLAINT

Plaintiff Kimberly J. Brown (hereinafter "Plaintiff") hereby makes the following allegations against Defendants Bellwether Creation Company, Michael Greeby, Storm Vaske and Does 1-4 (hereinafter, collectively, "Defendants"):

## NATURE OF ACTION

1. This is an action to recover damages resulting from Defendants' actions. Plaintiff alleges that Defendants:

   A) were unjustly enriched from Plaintiff's efforts, and;

   B) knowingly defamed Plaintiff, and;

   C) intentionally inflicted emotional distress on Plaintiff, and;

   D) committed fraud.

## PARTIES TO THIS MATTER

2. Plaintiff, Kimberly J. Brown, is an independent contractor and transactional attorney who resides in Chicago, Illinois. Plaintiff is also the creator of the concept behind the website LegacyComplete.com.

3. Defendant Bellwether Creation Company (together with its owners, agents, successors, assigns, employees and contractors, hereinafter "Bellwether") is a website development company owned in part by Defendant Michael Greeby (hereinafter "Greeby") and Defendant Storm Vaske (hereinafter "Vaske".)

4. The true names and capacities, whether individual, corporate, associate, or otherwise of defendants named herein as Does 1 through 4, inclusive, are unknown to Plaintiff who therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to show the true names and capacities of these defendants if and when the same have been ascertained. Based on information and belief, Plaintiff believes that each fictitiously named defendant may be responsible in law and in fact for the obligations alleged herein. Plaintiff believes and thereon alleges that at all relevant times each of the defendants were acting within the scope and course of agency and employment.

## JURISDICTION & VENUE

5. All actions related to this matter were performed in the city of Chicago, county of Cook, state of Illinois. Therefore, Cook County, Illinois is the proper venue for this action.

6. The Plaintiff Kimberly J. Brown and Defendants Michael Greeby and Storm Vaske are all individuals residing in Cook County, Illinois. Furthermore, Defendant Bellwether is a company registered to transact business in Illinois.

7. This Court has jurisdiction over this dispute as this complaint seeks damages in excess of $436,000, exclusive of punitive damages, interest and attorneys' fees.

## BACKGROUND & ALLEGATIONS

8. Each and every detail contained in each and every sentence in Paragraphs 9-53 herein is an allegation and should be read as "Plaintiff alleges...":

9. Plaintiff is a transactional attorney who created the concept for LegacyComplete.com, a website which brings attorneys and consumers together to simultaneously create living trust plans online thereby significantly reducing both the cost of the plan to the consumer and the amount of work required by the attorney (hereinafter "Website" or "LegacyComplete.com").

10. Legacy Complete LLC is a Nevada limited liability company (hereinafter "Legacy LLC") which contracted with Plaintiff to manage Legacy LLC and to build the Website. Plaintiff is not an owner of Legacy LLC. However, Plaintiff is a trustee of one of the two owners of Legacy LLC.

11. In 2015, Legacy LLC contracted with an unrelated web developer to build the Website (hereinafter "Previous Developer".) However, in January 2016, when the Previous Developer did not complete the Website, Legacy LLC hired Defendants to finish the Website. Defendants immediately began performing the contracted work.

12. In February 2016, following Defendants' completion of the Website, testing revealed that the Website contained several bugs and produced inconsistent results which Defendants attributed to flaws in the Previous Developer's code.

13. Defendants began asking Plaintiff about the possibility of discarding the existing code base and performing a full rebuild of the Website.

Investor

14. Defendants asked Plaintiff to pitch the Website to their business partner (hereinafter "Investor") who Defendants said has a history of funding innovative ideas. Defendants prepared the pitch deck for Plaintiff's presentation to Investor (Exhibit A).

15. Plaintiff pitched Investor on or about March 14, 2016. Defendants were in attendance for the pitch. All were in agreement that the pitch went well. Investor asked for some time to review the information Plaintiff had provided.

16. Immediately after the pitch, Defendants requested that Plaintiff not contact Investor directly. Instead, Defendants wanted Plaintiff to allow Defendants to use their existing relationship with Investor to negotiate the terms of a deal. Defendants stressed that they helped another client get funding from Investor this way. Defendants said that Investor would likely want to buy out one of the two Legacy LLC owners and possibly purchase a portion of the other owner's share as well.

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 3 of 13

17. Over the months that followed, Plaintiff allowed Defendants to handle the negotiations with Investor. When Plaintiff inquired about the status, Defendants would state that they were having difficulty reaching Investor or Defendants would request additional information from Plaintiff or Defendants would attribute the delay to Defendant Bellwether restructuring.

18. Plaintiff prepared all items requested by Defendants to aid them in securing a deal with Investor.

Redesigned Website

19. On March 21, 2016, Defendants offered to start redesigning the Website to avoid losing time waiting on the Investor. Defendants explained to Plaintiff that the Redesigned Website would be a derivative of the existing Website incorporating much of the question logic and forms used by the existing Website.

20. Defendants assured Plaintiff that it would take less than a month to complete the new Website (hereinafter "Redesigned Website.")

"Because I have a handful of extra people on the bench I recommend we green light them to start rebuilding the platform from the ground up. It is my expectation with this new build that I can push my team to have the rebuild fully test driven, developed, and completed in 4 weeks" (Exhibit B).

21. Plaintiff agreed to allow Defendants to begin rebuilding the Website on behalf of Legacy LLC. The design phase began the next day during the Design Kick-Off Meeting (Exhibit C).

22. Plaintiff requested that the existing Website be kept active during the construction of the Redesigned Website. The existing Website had bugs but was still the only potential source of revenue Legacy LLC had. Furthermore, since Legacy LLC had paid the Previous Developer $30,000, paid Defendants $4,000 and was expected to pay $22,250 additional to Defendants, the existing Website should be utilized, if only for a month.

23. Defendants were adamant that the time it would take to service the existing Website while building the Redesigned Website would push the completion of the Redesigned Website back months. Defendants gave Plaintiff their word that the

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 4 of 13

Redesigned Website would not take more than 4 weeks. Defendants disabled the purchasing mechanism on the existing Website so no new customers could make a purchase on the Website.

24. Plaintiff expressed that she might not be able to stay financially afloat if the Redesigned Website took longer than 4 weeks to complete. Plaintiff shared with Defendants that she was behind on her mortgage and financially tapped out due to the delayed launch of the Website. Plaintiff expressed that she could not afford to forgo compensation.

25. Plaintiff expressed that with the existing Website disabled, Plaintiff needed to carve out time in her day to work with clients directly so that she could generate income during the redesign period. Defendants expressed that if Plaintiff was not completely available to work on the Redesigned Website, the Redesigned Website's launch would be delayed since Plaintiff's assistance was critical to the timely completion of the Redesigned Website.

26. Plaintiff acquiesced. Although the Redesigned Website was a derivative of the existing Website, Plaintiff found herself devoting 70-80 hours each week performing task related to the Redesigned Website including but not limited to, preparing website copy, editing conditional logic, writing & editing the document forms, researching legal issues, preparing training information for consumers and attorneys, preparing marketing material, teaching Defendants about related legal concepts and responding to user inquiries.

27. Defendants presented the unfinished Redesigned Website to Plaintiff on or about May 22, 2016, eight (8) weeks after the Design Kick-Off Meeting, rather than the four (4) weeks initially promised (hereinafter "Final Walk-Through")(Exhibit D). Although the Final Walk-Through meeting occurred in May 2016, the Redesigned Website was not completed by Defendants until August 2016.

**Joint Venture**

28. Shortly after the Design Kick-Off meeting for the Redesigned Website which meeting occurred in March 2016, Defendants offered to enter a joint venture with Legacy LLC. It had been a few weeks since the presentation to Investor and, according to Defendants, Investor was still interested but undecided.

ELECTRONICALLY FILED
1/6/2017 3:54 PM
2017-L-000203
PAGE 5 of 13

29. Defendants negotiated a joint venture with Legacy LLC (hereinafter the "Joint Venture") which Joint Venture erased Legacy LLC's indebtedness to Defendants, required Defendants to build the Redesigned Website and required Defendants to provide tech support for the Redesigned Website. Defendants represented, and Plaintiff believes, the Joint Venture's ownership as: Legacy LLC 81% & Defendants 19% (Exhibit E). Defendants asked Plaintiff to work on building the Redesigned Website for the Joint Venture and Plaintiff agreed.

Offer

30. More than 8 weeks after the start of construction of the Redesigned Website and shortly after the Final Walk-Through meeting, Defendants asked Plaintiff what she would do if Defendants were to offer to purchase Legacy LLC for $300,000.

31. Plaintiff responded that she would recommend that Legacy LLC's owners refuse the offer because, notwithstanding her dire personal financial situation, the offer would not make Legacy LLC's owners whole. Plaintiff reminded Defendants that just two months prior, Defendants valued the business at $1,000,000 and based on that valuation, Legacy LLC's share of the Joint Venture should be $800,000, not $300,000. Defendants never presented an offer to purchase Legacy LLC.

Ideas

32. During the creation of the Redesigned Website, Plaintiff and Defendants held several executive team meetings for the Joint Venture executive team which team consisted of Defendants Greeby & Vaske and Plaintiff (hereinafter "Exec Team"). These meetings were intended to discuss the progress of the Redesigned Website and its launch. However, Defendants used the meetings to question Plaintiff about marketing opportunities, additional functionalities and other potential uses including, but not limited to, the following three ideas presented by Plaintiff.

33. During one Exec Team meeting, the topic of building an online notary functionality for the Redesigned Website was revisited. Plaintiff had mentioned this functionality previously. Plaintiff expressed that an online notary feature would further distinguish the Redesigned Website from existing estate planning websites. Defendants agreed. Defendants requested that Plaintiff research state specific online notary laws then make recommendations on implementation.

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 6 of 13

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 7 of 13

Plaintiff spent a significant amount of time researching the topic and made recommendations to Defendants for creating the functionality.

34. After presenting the information to Defendants, Defendants agreed that an online notary functionality was a good idea but stated that Defendants would need to include the function in a later version of the Redesigned Website.

35. However, in July 2016, Defendant Vaske sent Plaintiff a text stating that Defendant Vaske wrote a proposal to build and incorporate the online notary concept Plaintiff researched into a notary business his dad was purchasing (Exhibit F).

36. Another functionality that Plaintiff suggested to Defendants solved a potential fee-splitting issue which Plaintiff determined would be an obstacle to launching the Redesigned Website in several states. After contacting several state bar associations, Plaintiff suggested that creating a monthly membership plan for the Redesigned Website may avoid potential fee-splitting violations. Defendants were excited to pursue Plaintiff's membership plan option. Defendants stated that the necessary changes should only delay the launch by two weeks at most. Defendants expressed that they had already started making the necessary changes based on Plaintiff's preliminary monthly membership proposal.

37. Defendants asked Plaintiff to amend the Joint Venture's plan and projections to provide monthly memberships as the primary revenue source. Plaintiff spent a significant amount of time preparing the plan and projections. However, when Plaintiff presented Defendants with the plan and projections, Defendants informed Plaintiff that they would not be incorporating the membership plan idea into the Redesigned Website. Defendants expressed that Plaintiff would need to raise capital to pay for the changes if Plaintiff wanted the changes included in the Redesigned Website. Defendants expressed that they were overextended and could not devote manpower to make the changes.

38. In June 2016, Plaintiff noticed that a fast-growing attorney-review website (hereinafter "Review Site") had no online document preparation component associated with it. Plaintiff contacted the Review Site and scheduled a virtual meeting with the Review Site's business development manager. Plaintiff made a formal presentation to the Review Site's business development manager to

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 8 of 13

incorporate aspects of the Redesigned Website into a branded site for the Review Site. The Review Site's business development manager was open to the idea and asked Plaintiff to schedule a follow-up meeting with the Joint Venture's development team.

39. On or about July 20, 2016, Plaintiff conducted the follow-up presentation with Defendants and the Review Site's business development manager. The meeting concluded with the Review Site's business development manager expressing his interest in moving forward. The business development manager requested that the Joint Venture prepare a demo for the Review Site's decision makers.

40. Defendants offered to take the lead to prepare a demo of the ideas discussed. Defendants stated that the demo would be ready the following week. However, when Plaintiff followed up with Defendants a week later, Defendant Vaske claimed that he had spoken with the Review Site's business development manager who informed Defendants that the Review Site was no longer interested in working with the Joint Venture.

41. A few months later, Plaintiff received an email, which Plaintiff believes was sent to the Review Site's mailing list, announcing the Review Site's new online document prep program. The Review Site's new program was essentially the program that Plaintiff pitched to the Review Site and Defendants. Plaintiff does not know whether Defendants were involved in Review Site's new program.

**No Tech Support**

42. In August 2016, nearly five (5) months after Defendants started building the Redesigned Website, the Redesigned Website was ready for launch.

43. However, the week before the Website's first press release was to be distributed, Defendants announced that Defendants would not provide technical support for the Redesigned Website as Defendants had agreed to provide.

44. Defendants claimed that they spent more on the Redesigned Website than they anticipated and they were not willing to provide tech support. Defendants also claimed that they were short-staffed and could not afford to hire another developer. Defendants told Plaintiff that if Plaintiff wanted the Website to have tech support, Plaintiff would need to raise the capital to be able to hire a

developer to provide tech support.

45. Weeks before this announcement, Defendants expressed that an enterprise-level website, such as the Redesigned Website, is destined to fail without a strong tech support team. Thus, Defendants' refusal to provide tech support prevented the Redesigned Website from launching.

**Transfer of Code**

46. Plaintiff is an alumni of a business incubator. Following Defendants' announcement regarding tech support, Plaintiff scheduled to meet with one of the mentors to the incubator who owns and manages a successful web-development company. During the meeting, Mentor offered to provide tech support for the Website at no upfront cost, solving the Redesigned Website's tech support issue.

47. Mentor instructed Plaintiff to have Defendants transfer the code base to Mentor so that Mentor could familiarize Mentor's tech support group with the code base. Mentor stated that his team should be ready to provide tech support shortly after receiving the code base.

48. Following Plaintiff's meeting with Mentor, Plaintiff called and emailed Defendants to share the good news about Mentor's offer as well as to instruct the Defendants to transfer the code base to Mentor (Exhibit G).

49. Receiving no response from Defendants, Plaintiff spoke with an employee of Defendants who confirmed that Defendants Vaske & Greeby received Plaintiff's messages. However, neither Defendant Vaske nor Defendant Greeby responded to Plaintiff's communications. Furthermore, the employee with whom Plaintiff spoke has since resigned from Defendant Bellwether (Exhibit H).

**Status**

50. Plaintiff has sent multiple emails to Defendants requesting the Redesigned Website's code be transferred (Exhibit I). Each request has been ignored. Plaintiff has not received any correspondence from Defendant Vaske or Defendant Greeby in more than four (4) months.

51. Plaintiff is unable to access the code base to transfer it to Mentor without

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 9 of 13

Defendants' assistance since it is on accounts which are inaccessible to Plaintiff.

52. The Redesigned Website was designed to notify Plaintiff when a new user registers on the Redesigned Website. However, Plaintiff is no longer receiving user notices from the Redesigned Website. In addition, Plaintiff's administrator login for the Redesigned Website appears to no longer be operational. Furthermore, Plaintiff wonders if her emails are being rerouted as some emails intended for Plaintiff have bounced.

53. Plaintiff estimates that she worked more than 2000 hours on Redesigned Website related-activities from April through December 2016: an approximate average of; 75 hours/week from April 2016 through September 2016, 45 hours/week in October 2016 and 25 hours/week in November & December 2016. If Plaintiff's hourly rate is $200, the value of Plaintiff's services is estimated at approximately $436,000. Plaintiff has not been compensated for this time.

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 10 of 13

## COUNT 1: UNJUST ENRICHMENT

54. Plaintiff realleges and incorporates by reference the allegations set forth above in Paragraphs 8-53.

55. Plaintiff alleges that Defendants are benefiting from Plaintiff's ideas, work, contacts, good will and the code base developed with Plaintiff's help;

56. Plaintiff alleges that she expended significant resources and time to assist in the creation of the Redesigned Website and related materials;

57. Plaintiff alleges that Defendants' retention of the benefit of Plaintiff's work without remunerating Plaintiff is unconscionable.

## COUNT 2: DEFAMATION

58. Plaintiff realleges and incorporates by reference the allegations set forth above in Paragraphs 8-53.

59. Plaintiff alleges that Defendants intentionally changed information such that user inquiries and emails go unanswered or are responded to by someone other than Plaintiff and Defendants displayed incorrect contact information on the

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 11 of 13

Redesigned Website with the intention of making it difficult to contact Plaintiff.

60. Plaintiff alleges that Defendants are intentionally taking these actions so that users incorrectly perceive that Plaintiff is receiving their inquiries but is ignoring them and/or incorrectly perceive that Plaintiff is still associated with the Redesigned Website.

61. Plaintiff alleges Defendants are intentionally performing these acts in order to damage Plaintiff's credibility and reputation.

62. Plaintiff alleges that Defendants' defamatory actions are injuring Plaintiff's reputation and financial well-being.

## COUNT 3: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

63. Plaintiff realleges and incorporates by reference the allegations set forth above in Paragraphs 8-53.

64. Plaintiff alleges that Defendants' actions were intentional with the goal of inflicting financial and emotional harm on Plaintiff.

65. Plaintiff alleges Defendants' actions were extreme and outrageous.

66. Plaintiff alleges that Defendants' actions have caused Plaintiff severe physical and emotional distress, including but not limited to panic attacks, anxiety, insomnia and significant weight fluctuations.

## COUNT 4: FRAUD

67. Plaintiff realleges and incorporates by reference the allegations set forth above in Paragraphs 8-53.

68. Plaintiff alleges that Defendants knowingly made several misrepresentations including, but not limited to, representing that Defendants' goal was to launch the Redesigned Website: 1) in May 2016, and 2) that Plaintiff would be compensated for her time;

69. Plaintiff alleges Defendants had no intention of launching the Redesigned Website in May 2016 and no intention of compensating Plaintiff for her time and

knowledge;

70. Plaintiff alleges Defendants intended to deceive Plaintiff into contributing her time and knowledge by making Defendants' misrepresentations;

71. Plaintiff alleges that Plaintiff justifiably relied on Defendants representations and expended thousands of hours of Plaintiff's time in furtherance of the Redesigned Website;

72. Plaintiff alleges that Plaintiff is currently suffering financial hardship and emotional distress due to Plaintiff's reliance on Defendants' misrepresentations, including, but limited to, being more than $32,000 in arrears on her mortgage.

## DAMAGES

Plaintiff alleges that each of these actions were malicious, intentional and oppressive, justifying an award of punitive damages so that Defendants will not engage in such conduct in the future.

WHEREFORE, PLAINTIFF PRAYS for judgment against Defendants as follows:

1. For the value of Plaintiff's services, which value is estimated at $436,000, and;

2. For punitive and compensatory damages according to proof as determined, as determined at trial, and;

3. For reasonable attorneys' fees and costs incurred herein as determined at trial, and;

4. For such other and further relief as the court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 12 of 13

Respectfully Submitted on January 6, 2017
Kimberly J. Brown, Pro Se
4630 S. Greenwood Ave.
Chicago, IL 60653
(773) 570-6250


By: __x/kimberlyj.brown/x__
Kimberly J. Brown, Pro Se, licensed attorney


Exhibit A: Email Subject: Investor Pitch Redesign for Doug
Exhibit B: Email Subject: Legacy Decision
Exhibit C: Email Invitation: Design Kick-Off
Exhibit D: Email Subject: Monday Final Walk-Through
Exhibit E: Email Subject: Following up on our call with John
Exhibit F: SMS From Storm Vaske July 29, 2016
Exhibit G: Email Subject: Good News!
Exhibit H: Email Subject: Resignation
Exhibit I: Email Subject: Filing A Police Report

ELECTRONICALLY FILED
1/6/2017 5:54 PM
2017-L-000203
PAGE 13 of 13