**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY JEAN BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20-cv-04893 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| MICHELLE MONTGOMERY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Kimberly Jean Brown was working as an estate-planning attorney when she decided to start a new business. One of Brown's former clients offered to invest the entire amount of capital needed for the project. Although initially reluctant to go into business with an elderly former client, she eventually decided to accept his investment. As Brown worked to launch her business, she came into conflict with her investor's business manager, Defendant Lila Goldston, and his attorney, Defendant Michelle Montgomery. Both Goldston and Montgomery believed that Brown had taken advantage of her former client and conveyed that sentiment to others, including Defendant Erika Williams, a financial advisor at JPMorgan Chase Bank, N.A. ("JPMorgan").[1] Brown claims that Williams then informed her coworkers about the accusations, causing Brown significant financial and reputational damage. As a result, Brown has filed the present action asserting several common law tort claims against Montgomery, Goldston, Williams, JPMorgan, and James D. Montgomery & Associates, Ltd. ("Firm"). Now before the Court are Defendants' four motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. Nos. 51–53,

---

[1] While the amended complaint names JP Morgan Chase Co. as a Defendant, JPMorgan contends that the proper Defendant is actually JPMorgan Chase Bank, N.A.

63), which together seek dismissal of the amended complaint in its entirety. For the reasons that follow, Defendants' motions are granted.

## BACKGROUND

For the purposes of the motions to dismiss, the Court accepts all well-pleaded facts in the amended complaint as true and views those facts in the light most favorable to Brown as the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The amended complaint alleges as follows.

Brown is an attorney licensed in Illinois who had a practice focused on estate planning for middle- and lower-income clients. (Am. Compl. ¶ 4, Dkt. No. 49.) Prior to the events underlying this litigation, many of Brown's estate-planning clients were referred to her by employees of a Chicago branch of JPMorgan. (*Id.* ¶ 5.) One of the JPMorgan employees who made referrals to Brown was Williams, a (now former) JP Morgan financial advisor. (*Id.*) Relevant here, Williams introduced Brown to Dr. Charles Hamilton, a prominent political scientist and civil rights leader. (*Id.* ¶ 7.) After Brown completed her estate-planning work for Hamilton, he took on Brown as a mentee and the two became close friends. (*Id.*) Whereas Brown typically met with former clients only once every few years, she would meet with Hamilton several times a month. (*Id.*)

In 2013, Brown devised a business plan to launch a software program that would make estate-planning resources cheaply available to middle- and lower-income individuals. (*Id.* ¶ 8.) Initially, Brown relied on her own funds and loans to develop the software. (*Id.* ¶ 9.) By February 2015, however, it became apparent that she would not be able to complete the software without at least $25,000 in additional capital. (*Id.* ¶¶ 9–10.) When Hamilton learned about Brown's situation, he offered her the full $25,000 as a gift. (*Id.* ¶ 11.) Brown declined Hamilton's offer out of concern about doing business with a former client and also due to Hamilton's advanced age. (*Id.*

¶¶ 7, 11.) Yet Hamilton continued his attempts at supporting Brown's business venture and asked Brown to discuss her project with Goldston, to whom he referred as his business manager.[2] (*Id.* ¶ 12.)

Although still reluctant to accept a gift or investment from an elderly former client, Brown gave a formal presentation on her business plan to Hamilton and Goldston as a courtesy. (*Id.* ¶ 14.) During the presentation, Goldston recommended that Brown abandon the software code she had developed and start anew using a different software developer. (*Id.*) To implement Goldston's recommendations, Brown determined that she would need to seek $125,000 in capital. (*Id.* ¶ 15.) After Brown gave a revised pitch to Hamilton and Goldston, Goldston informed Brown that Hamilton would invest the full $125,000. (*Id.* ¶ 16.) In exchange, Goldston proposed that Brown create a new business entity for her venture in which Hamilton would have a 25% ownership share. (*Id.*) Goldston further insisted that Brown agree not to seek additional investors without first obtaining Hamilton's approval. (*Id.*) Still, Brown was concerned about accepting a large investment from Hamilton. (*Id.* ¶¶ 17–19.)

Ultimately, Goldston persuaded Brown to accept Hamilton's offer by assuring her that Hamilton's investment was consistent with his history of investing in female-owned businesses. (*Id.* ¶¶ 19–20.) Nonetheless, to avoid the appearance of impropriety, Brown insisted that the deal include certain terms. (*Id.* ¶ 21.) First, Brown would communicate with Goldston rather than Hamilton about business matters. (*Id.*) Second, Hamilton would be prohibited from hiring Brown as an attorney in the future. (*Id.*) Third, Hamilton would not invest the $125,000 as a lump sum but instead would invest only the amount needed each month, subject to Goldston's review and

---

[2] Goldston denies that she served as Hamilton's business manager. (Goldston's Mot. to Dismiss at 2, Dkt. No. 52.) But at the motion to dismiss stage, the Court must accept as true the amended complaint's allegations regarding Goldston's role.

approval. (*Id.*) And fourth, Brown would hold monthly progress meetings to update Goldston and Hamilton on the business's progress. (*Id.*)

On May 14, 2015, Brown formed a Nevada limited liability company called Legacy Complete. (*Id.* ¶ 22.) Hamilton's trust received a 25% ownership interest in Legacy Complete and Brown's family trust owned the remaining 75%. (*Id.*) Under the new company's operating agreement, Brown would serve as Legacy Complete's manager and receive a $100,000 annual salary. (*Id.* ¶ 23.) As requested by Goldston, the operating agreement included a provision that allowed Hamilton the right to refuse additional investors. (*Id.* ¶ 24.)

Shortly after the creation of Legacy Complete, Brown began to perceive Goldston as exercising an outsized influence over Hamilton. (*Id.* ¶ 27.) In particular, Brown observed that Goldston was ignoring Hamilton's desires in favor of her own wishes and was asserting control over Hamilton's finances and healthcare. (*Id.*) According to Brown, Goldston suggested that she was willing to sacrifice Hamilton's investment in Legacy Complete if it furthered her own purposes. (*Id.*) Brown raised her concerns with both Goldston and Hamilton and requested that Hamilton protect his interests by retaining an attorney to work with Goldston. (*Id.* ¶ 28.) Brown further asked Hamilton to agree to sell his ownership interest in Legacy Complete or convert it into a loan, which would allow Legacy Complete to raise additional capital. (*Id.* ¶ 29.) Hamilton agreed to work toward converting his investment into a loan. (*Id.*) To effectuate both of Brown's requests, Hamilton retained Montgomery, a partner at the Firm. (*Id.* ¶ 30.)

Right away, Montgomery and Brown had a hostile relationship, with Brown claiming that Montgomery was antagonistic and accusatory toward her. (*Id.* ¶ 31.) Montgomery claimed that her job was to "clean up" Brown's mess. (*Id.*) She also accused Brown of taking advantage of Hamilton by accepting his investment, even though Brown had made concerted efforts to protect

Hamilton and mitigate any potential conflicts. (*Id.* ¶ 32.) Due to Montgomery's accusation, and in an effort to protect her professional reputation, Brown asked the Illinois Attorney Review and Discipline Commission ("ARDC") to review both her actions and Montgomery's actions. (*Id.* ¶ 33.) In a written response to Brown's ARDC complaint, Montgomery outlined her concerns over Brown's business relationship with Hamilton. (*Id.*) The ARDC conducted an investigation and concluded that Brown's conduct did not warrant any disciplinary measures. (*Id.*)

Meanwhile, Brown continued to work toward launching her estate-planning software. Immediately after forming Legacy Complete, Brown hired a software developer. (*Id.* ¶ 34.) Around December 2015, Brown concluded that the developer would not be able to complete the software and hired a new developer, Bellweather Creation Company ("Bellweather"), to redesign and rebuild the software completely. (*Id.* ¶¶ 34–35.) But the change in developers depleted Legacy Complete's capital and left the company without sufficient funds to launch the software successfully. (*Id.* ¶ 35.) Around August 2015, Brown began discussing Legacy Complete's need for additional capital with Goldston. (*Id.* ¶ 36.) Goldston advised Hamilton against investing additional capital and further recommended against allowing Brown to solicit new investors. (*Id.*) Moreover, Montgomery and Brown were unable to reach an agreement to convert Hamilton's investment into a loan. (*Id.* ¶ 37.) And, like Goldston, Montgomery advised Hamilton to refrain from providing additional capital to Legacy Complete or consenting to additional investors. (*Id.*) Hamilton heeded the advice of Goldston and Montgomery. (*Id.* ¶ 38.)

Lacking sufficient capital, Brown's only option under Legacy Complete's operating agreement was to create a joint venture between Legacy Complete and Bellweather. (*Id.* ¶ 39.) Under that arrangement, Brown worked 70 to 80 hours per week without compensation in an effort to keep her business alive. (*Id.*) As a result, Brown depleted her savings and was forced to

sell her home. (*Id.* ¶¶ 40–41.) Despite Brown's efforts, Legacy Complete never was able to launch its estate-planning software. (*Id.* ¶ 40.) In May 2017, Legacy Complete was administratively dissolved. (*Id.*)

Following Legacy Complete's failure, Brown learned that Goldston and Montgomery had made several derogatory comments about her in 2015 and 2016. (*Id.* ¶ 42.) Specifically, Goldston and Montgomery told several third parties that Brown had taken advantage of Hamilton. (*Id.*) In addition, Montgomery sent Hamilton a letter asserting that Brown may have violated the ethical rules for the legal profession promulgated by the Illinois Supreme Court. (*Id.*) Brown also asserts that Goldston and Montgomery made the same false representations to Williams, and Williams then repeated those representations to her coworkers at JPMorgan. (*Id.* ¶ 43.) In turn, those JPMorgan employees, who had been Brown's primary source for referrals, shared Goldston and Montgomery's false representations to Brown's former clients. (*Id.*) For example, when Brown met with one former client who had been referred to her by JPMorgan, that client was visibly upset and scolded Brown, which represented a marked contrast to their previously cordial relationship. (*Id.* ¶ 44.) Brown believes that the former client's attitude toward her changed after hearing accusations through JPMorgan employees that Brown took advantage of Hamilton. (*Id.*) Because of the broad dissemination of the allegedly false accusations, Brown lost business for her estate-planning legal services. (*Id.* ¶ 46.)

Based on these allegations, Brown has brought the present action against Defendants, claiming that their conduct damaged her reputation and caused her to suffer financial loss from the failure of Legacy Complete and the loss of clients for her estate-planning law practice. Count I of the eight-count amended complaint asserts a claim against Goldston and Montgomery for tortious interference with a contractual relationship. Counts II through VII assert claims against

Goldston, Montgomery, and Williams for tortious interference with prospective business relations, defamation, intrusion upon seclusion, false light, intentional infliction of emotional distress ("IIED"), and civil conspiracy. Finally, Count VIII seeks to hold JPMorgan vicariously liable for the actions of its employee, Williams, and to hold the Firm vicariously liable for the actions of one of its partners, Montgomery.[3]

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

### I.     Tortious Interference with a Contractual Relationship

Count I of the amended complaint asserts a claim against Goldston and Montgomery for tortious interference with a contractual relationship. Specifically, according to Brown, Goldston and Montgomery induced Hamilton to breach Legacy Complete's operating agreement by persuading him to withhold additional capital and deny Brown permission to seek outside investments. To state a claim for tortious interference with a contractual relationship in Illinois, a plaintiff must plead: "(1) the existence of a contract; (2) the defendants' awareness of the contract;

---

[3] Because of the vicarious liability claim, Counts II through VII effectively set forth claims against all Defendants. Accordingly, the Court will refer to Defendants collectively when discussing the claims arising under those counts.

(3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages." *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005).

Montgomery and Goldston contend that Brown has failed to plead adequately that Hamilton actually breached Legacy Complete's operating agreement. The amended complaint alleges that Hamilton breached a provision in the operating agreement obligating him to take whatever action may be necessary to ensure Legacy Complete's success if he exercised his right to refuse outside investment in the company. (*See* Am. Compl. ¶¶ 24, 48.) Notably, the amended complaint does not attach Legacy Complete's operating agreement as an exhibit. Thus, to show that the operating agreement contains no such provision, Montgomery and Goldston attach the full operating agreement as an exhibit to their respective motions to dismiss. Normally, matters outside the pleadings cannot be considered in connection with a motion to dismiss. *See* Fed. R. Civ. P. 12(d). However, "[d]ocuments that a defendant attaches to a motion to dismiss are considered a part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). That is the case here. Legacy Complete's operating agreement undoubtedly is central to Brown's tortious interference with a contractual relationship claim, and thus the amended complaint incorporates by reference the full contract.

Brown, however, argues that the Court cannot consider the Legacy Complete operating agreement submitted by Montgomery and Goldston due to questions regarding its authenticity. Indeed, as the Seventh Circuit has explained, at the motion to dismiss stage, a court may only consider a document referenced by, but not attached to, the complaint if the document is "concededly authentic." *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). And Brown correctly points out that neither Montgomery nor Goldston have submitted a declaration attesting

to the authenticity of the operating agreement. Montgomery nonetheless contends that the Court should consider the operating agreement because Brown only "questions" the authenticity of her exhibit but does not actually claim that it is inauthentic. (*See* Pl.'s Resp. to Defs.' Mots. to Dismiss at 4, Dkt. No. 64.)

The Court agrees that Brown must do more than simply note that the operating agreement has not been authenticated. Rather, she must give the Court "good reason to question [its] authenticity." *Heuberger v. Smith*, No. 3:16-CV-386-JD-JEM, 2017 WL 3923271, at *9 (N.D. Ind. Sept. 7, 2017). Here, both Montgomery and Goldston have attached an identical version of the Legacy Complete operating agreement as an exhibit to their motions to dismiss. Each page of the agreement appears to have been initialed by both Brown and Hamilton, and their full signatures appear on the last page. (*See* Montgomery Defs.' Mot. to Dismiss, Ex. 1, Dkt. No. 51-1; Goldston's Mot. to Dismiss, Ex. 1, Dkt. No. 52-1.) Thus, the version of the agreement submitted by Montgomery and Goldston appears authentic and, "[u]nless [Brown] has good faith grounds to dispute its authenticity, the [C]ourt may consider it." *Sa'Buttar Health & Med., P.C. v. Tap Pharms., Inc.*, No. 03 C 4074, 2004 WL 1510023, at *3 (N.D. Ill. July 2, 2004) (considering a signed and dated contract attached by the defendant as an exhibit even though unauthenticated because the plaintiff did not suggest that the document was inauthentic); *see also ABN AMRO, Inc. v. Cap. Int'l Ltd.*, No. 04 C 3123, 2007 WL 845046, at *11 (N.D. Ill. Mar. 16, 2007) ("[A]lthough Plaintiff argues that the agreements are unauthenticated, Plaintiff does not assert that they are inauthentic."). Brown fails to explain why she has a good faith basis to question the authenticity of the operating agreement submitted by Montgomery and Goldston, even though Brown is a party to the agreement and thus should have personal knowledge of whether the agreement attached to Montgomery's and Goldston's motions is a true and correct copy of the one

she signed. For that reason, the Court will consider the full operating agreement in connection with the motions to dismiss.

Having the full Legacy Complete operating agreement properly before it, the Court discerns that the document contains no provision requiring Hamilton to provide additional support should he refuse to approve outside investments in the company. To the contrary, section 2.2 of the agreement provides that no Legacy Complete member "shall be obligated to make any additional contribution to the Company's capital," subject to a provision not relevant here. (*E.g.*, Montgomery Defs.' Mot. to Dismiss, Ex. 1 § 2.2.) Consequently, Brown has not adequately alleged the actual-breach element of her tortious interference with a contractual relationship claims against Montgomery and Goldston, and those claims are dismissed.

## II.     Tortious Interference with Prospective Business Relations

In Count II, Brown asserts claims against all Defendants for tortious interference with prospective business relations. In particular, Brown alleges that each Defendant falsely represented to others that she was taking advantage of Hamilton, which tarnished her reputation as an estate-planning lawyer and negatively affected her ability to attract clients. A claim for tortious interference with prospective business relations requires the plaintiff to allege: "(1) a reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of the expectation, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damage to the plaintiff resulting from the defendant's interference." *Atanus v. Am. Airlines, Inc.*, 932 N.E.2d 1044, 1048 (Ill. App. Ct. 2010).

Defendants argue that Brown fails to plead sufficiently that she had a reasonable expectancy of a business relationship. "A reasonable expectancy requires more than the hope or

opportunity of a future business relationship." *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1154 (N.D. Ill. 2016) (internal quotation marks omitted). Further, to satisfy this element, "a plaintiff must specifically identify the customers who actually contemplated entering into a business relationship with the plaintiff." *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014) (internal quotation marks omitted). "Merely providing proof of a past customer relationship is not sufficient to prove a 'reasonable expectation' of a business relationship in the future." *Id.* A plaintiff must also plead that she has a business expectancy with a specific third party, as well as an action by the defendant directed toward that third party. *Ali v. Shaw*, 481 F.3d 942, 945–46 (7th Cir. 2007); *Associated Underwriters of Am. Agency, Inc. v. McCarthy*, 826 N.E.2d 1160, 1169 (Ill. App. Ct. 2005).

Here, Brown alleges that she had a reasonable expectation that her past estate-planning clients would retain her in the future to perform additional work and that she would continue to gain new clients through referrals by JPMorgan employees. While Brown has not identified any former or prospective client by name, such specificity is not necessary. *Downers Grove Volkswagen, Inc. v. Wigglesworth Imps., Inc.*, 546 N.E.2d 33, 37 (Ill. App. Ct. 1989) (explaining that a plaintiff is not required to "allege the identity of the third party or parties by name"). Rather, Brown need only plead an identifiable class of former or prospective clients. *See, e.g.*, *Manley v. Boat/U.S. Inc.*, No. 13-CV-5551, 2014 WL 1647117, at *5 (N.D. Ill. Apr. 23, 2014) (denying dismissal where the plaintiff "identified a class of prospective customers . . . that might have used its services but for Defendants' alleged statements"); *Downers Grove Volkswagen*, 546 N.E.2d at 37 ("[A] class of identifiable third persons, past and future customers, has been alleged."). As to future customers, Brown alleges that she previously received a steady stream of referrals from JPMorgan that generated substantial business for her estate-planning practice and

that those referrals dried up due to Defendants' conduct. (Am. Compl. ¶¶ 5, 52–54.) Those

prospective clients referred by JPMorgan are a sufficiently identifiable class of third persons with

whom Brown had a reasonable business expectancy. Similarly, Brown has alleged that she had a

track record of providing high-quality services for her clients, and the fact that she met with

former clients from time to time at least leads to a reasonable inference that she had a reasonable

expectation of receiving future work from former clients. (*Id.* ¶¶ 5–7.)

 To the extent Brown has pleaded a reasonable business expectancy (and the Court finds

that she has), Defendants further assert that she has failed to allege that any Defendant directed

their actions toward any former or prospective client. "It is not enough for the defendant's action

to impact a third party; rather, the defendant's action must be directed towards the third party."

*Boffa Surgical Grp. LLC v. Managed Healthcare Assocs. Ltd.*, 47 N.E.3d 569, 577 (Ill. App. Ct.

2015). Here, with respect to prospective clients, Brown's allegations establish only that

Defendants directed their representations about Brown and Hamilton's relationship toward other

JPMorgan employees who then decided against making future referrals to Brown as a result. For

example, Brown alleges that Goldston and Montgomery made their false statements to Williams,

"who in turn made the same false representations to other employees at [JPMorgan] who were

referral sources to Ms. Brown." (Am. Compl. ¶ 43.) But for a defendant's conduct to support a

tortious interference claim, it must "be directed in the first instance at the third party." *Boffa*, 47

N.E.3d at 577–78; *see also Sunny Handicraft Ltd. v. Envision This!, LLC*, No. 14-cv-1512, 2015

WL 231108, at *9 (N.D. Ill. Jan. 16, 2015) ("[A] claim for tortious interference requires more

than an allegation of conduct directed at any third party. The claim must involve wrongful

conduct directed toward the alleged third party business prospect."). Thus, in *Boffa*, the Illinois

appellate court rejected a tortious interference claim predicated on conduct that "prevented

unnamed physicians from referring patients to the [plaintiff] and prevented unnamed patients from receiving services from the [plaintiff]." *Boffa*, 47 N.E.3d at 577–78. Allegations concerning Defendants' conduct directed at former clients are similarly attenuated, as Brown alleges that unnamed JPMorgan employees shared what they heard from Williams with one or more of Brown's former clients. (Am. Compl. ¶¶ 43–44.)

The amended complaint does allege at least one act by Williams directed toward Brown's former clients. Specifically, Brown alleges that Williams "and other agents of [JPMorgan] acting on [Williams's] behalf contacted several of Ms. Brown's past clients who were referred to Ms. Brown by [JPMorgan] to inquire into whether she had acted inappropriately toward them." (*Id.* ¶ 45.) This allegation, however, only suggests that Williams and JPMorgan reached out to ask questions; it does not suggest that any false representation was made in those contacts. Perhaps the nature of the inquiries could be viewed as implying misconduct on Brown's part, but the "purposeful interference" element requires showing some impropriety on the part of the defendant. *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998). While asking Brown's former clients whether she acted improperly toward them may negatively reflect on Brown, such an inquiry is not improper, particularly when considering the entirety of the amended complaint's allegations. Brown does not claim that Williams had any involvement in Montgomery and Goldston's alleged misconduct with respect to Legacy Complete or Hamilton's investment in the company. Instead, Brown alleges only that Montgomery and Goldston made their false representations to Williams; she does not further allege that Williams knew the representations were false or should immediately have recognized their falsity. Given that JPMorgan was referring some of its clients to Brown's estate-planning practice, it would be entirely reasonable for Williams and other JPMorgan employees to investigate Montgomery and Goldston's claims

further by reaching out to individuals they had previously referred to Brown. Viewed as a whole, the allegations suggest that Williams was acting with the intent to protect her and JPMorgan's business interests rather than to injure Brown's relationships with her former clients.

In sum, Brown has failed to plead facts plausibly suggesting that any Defendant purposefully interfered with her reasonable expectancy of business relationships with former and prospective clients. For that reason, the purposeful interference with prospective business relations claim in Count II is dismissed.

### III. Defamation

Brown also asserts a defamation claim based on each Defendant's various statements claiming that she took advantage of Hamilton or otherwise negatively characterizing her decision to accept Hamilton's investment. In Illinois, a "statement is considered defamatory if it tends to cause such harm to the reputation of another that it lowers the person in the eyes of the community or deters third persons from associating with her." *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996). To state a defamation claim, a plaintiff must allege facts showing: (1) a false statement by the defendant about the plaintiff; (2) the defendant made an unprivileged publication of that statement to a third party; and (3) that publication caused damages. *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839 (Ill. 2006).

There are two recognized types of defamatory statements in Illinois: defamation *per se* and defamation *per quod*. *Naleway v. Agnich*, 897 N.E.2d 902, 908 (Ill. App. Ct. 2008). A defamatory statement is actionable *per se* where "its harm is obvious and apparent on its face." *Solaia Tech.*, 852 N.E.2d at 839. Illinois recognizes five categories of statements considered defamatory *per se*:

> (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that

person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication.

*Id.* On the other hand, a statement may be defamatory *per quod* where the statement is either "defamatory on its face, but does not fall within one of the limited categories of statements that are actionable *per se*" or not defamatory on its face but can be shown to have injurious meaning by resort to extrinsic evidence. *Bryson*, 672 N.E.2d at 1221. Unlike in a defamation *per se* action, in a *per quod* action, the plaintiff must plead special damages from the statement—meaning "actual damage to her reputation and pecuniary loss resulting from the defamatory statement." *Id.* at 1222. Although Brown does not specify whether she is pleading defamation *per se* or *per quod*, the Court construes the claims as defamation *per se*, since the alleged defamatory statements suggest that Brown either failed to perform her duties as an estate-planning attorney with integrity or otherwise prejudiced Brown in that profession.

Defendants first contend that the defamation claims must be dismissed as time-barred. A defamation claim is subject to a one-year statute of limitations in Illinois. 735 ILCS 5/13-201. Normally, a plaintiff's complaint need not anticipate an affirmative defense such as the statute of limitations to survive a motion to dismiss. *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). "The exception occurs where . . . the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations." *Id.* Here, Defendants assert that the amended complaint expressly states that each Defendant made their false representations at various points between 2015 and 2016, but the present action was not initiated until 2020.

Brown does not deny that each defamatory statement was made outside the one-year statute of limitations but argues that the Court should apply the discovery rule and find that the claims did not accrue until just before the commencement of this lawsuit. "It has been generally

held that in defamation cases the cause of action accrues and the statute of limitations begins to run on the date of publication of the defamatory material." *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.*, 334 N.E.2d 160, 161 (Ill. 1975). However, in circumstances where the publication was "'hidden, inherently undiscoverable, or inherently unknowable,' Illinois courts apply the 'discovery rule' such that the statute of limitations does not accrue until the plaintiff knew or should have known of the defamatory [statements]." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 435 (7th Cir. 2009) (quoting *Blair v. Nev. Landing P'ship*, 859 N.E.2d 1188, 1195 (Ill. App. Ct. 2006)). Thus, courts have found the discovery rule applicable in cases involving oral or written statements "when the plaintiff was not present at the time of the statement and the statement was not made publicly." *Maddie v. Siebel Sys., Inc.*, No. 04 C 3419, 2004 WL 2515827, at *2 (N.D. Ill. Nov. 5, 2004). And here, it can be reasonably inferred from the amended complaint that Defendants mostly made the purportedly defamatory statements outside of Brown's presence and in non-public settings. Moreover, Brown claims that she did not become aware of the statements until she received Montgomery's response to her ARDC complaint in July 2020. (*See* Am. Compl. ¶ 33.)

With one exception, nothing in the amended complaint would allow the Court to conclude definitively at this stage in the proceeding that the discovery rule is inapplicable and Brown's defamation claims are time-barred. The Court can dismiss any defamation claims predicated on statements made by Montgomery to Hamilton because the amended complaint and its exhibits plainly reveal that Montgomery's statements to Hamilton are time-barred. *See Beam v. IPCO Corp.*, 838 F.2d 242, 244 (7th Cir. 1988) ("[T]he district court is entitled to consider exhibits attached to the complaint as part of the pleadings."). In particular, Brown alleges that Montgomery sent Hamilton a letter in September 2015 falsely accusing Brown of violating the

Illinois Supreme Court's Rules of Professional Conduct for the legal profession. (Am. Compl. ¶ 42.) Brown further alleges that Montgomery emailed Brown falsely claiming that Brown had acted unethically in her dealings with Hamilton in April 2016. (Am. Compl. ¶ 33.) Both communications are attached as exhibits to the amended complaint. In her 2015 letter to Hamilton, Montgomery explains that Brown "***may have*** violated several of the ethical rules proscribed by the Supreme Court of Illinois Rules of Professional Conduct" and even if her conduct failed "to rise to the level of a disciplinary infraction," it was "ethically questionable." (Am. Compl., Ex. C, Dkt. No. 49-3 (emphasis added).) Then, in her email to Brown in 2016, Montgomery accuses Brown of failing to comply "with the spirit of the ethical rules governing attorneys" in her dealings with Hamilton. (Am. Compl., Ex. B, Dkt. No. 49-2.) At this point, Brown should have known that Montgomery would have advised her client, Hamilton, that Brown's conduct raised concerns under Illinois' Rules of Professional Conduct. Consequently, the Court finds that any defamation claims arising from Montgomery's 2015 letter to Hamilton accrued in April 2016 and are therefore time-barred.

Aside from Montgomery's statements to Hamilton, the remaining statements cited by Brown as defamatory are not definitively time-barred and thus the Court turns to consider whether any of those statements can support a defamation *per se* claim. Broadly, Brown alleges that Defendants defamed her by spreading the false accusation that Brown took advantage of her elderly former client by accepting his investment in Legacy Complete. However, a statement may be defamatory *per se* but still be protected by the First Amendment as an expression of opinion. *Solaia Tech.*, 852 N.E.2d at 839. "Specifically, the [F]irst [A]mendment prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts." *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1022 (Ill.

2008). At the same time, "there is no artificial distinction between opinion and fact: a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole." *Solaia Tech.*, 852 N.E.2d at 840. "The test is restrictive: a defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact." *Id.* Among the factors to be considered are "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Id.* The determination of whether a statement is a protected expression of opinion or an actionable statement of fact is a question of law for the court. *Tirio v. Dalton*, 144 N.E.3d 1261, 1276 (Ill. App. Ct. 2019).

The Court finds that the unadorned statement that Brown took advantage of Hamilton is a protected statement of opinion because it does not have a precise and readily understood meaning, nor is it objectively verifiable. Absent a specific factual context, there is no objective way of knowing whether Brown took advantage of Hamilton and the statement is instead purely an expression of opinion regarding their business relationship. *See Manjarres v. Nalco Co.*, No. 09 C 4689, 2010 WL 918072, at *3 (N.D. Ill. Mar. 9, 2010) ("Courts have held . . . vague statements [such as the defendant's claim that the plaintiff was "unprofessional" and "incompetent"] capable of verification only when a specific factual basis or context is also provided."); *Wynne v. Loyola Univ. of Chi.*, 741 N.E.2d 669, 676 (Ill. App. Ct. 2000) ("[T]he vaguer and more generalized the opinion, the more likely the opinion is nonactionable as a matter of law."). It is the type of loose, figurative language commonly used by those who feel shortchanged in a business transaction.

To the extent Defendants provided the additional context that their opinion was based on the fact that Brown accepted an investment from Hamilton despite his age and potential for conflict, the accusation remains overly subjective. Particularly in the business context, views on

whether Brown took advantage of Hamilton could differ from person to person—what one person views as a routine unsuccessful investment might be viewed by another as a grift. *See, e.g.*, *Ludlow v. Nw. Univ.*, 79 F. Supp. 3d 824, 840 (N.D. Ill. 2015) (finding the defendant's statement characterizing a relationship as "deeply inappropriate" to be a non-verifiable opinion); *Pitale v. Holestine*, No. 11 C 00921, 2012 WL 638755, at *7 (N.D. Ill. Feb. 27, 2012) (explaining that statements accusing the plaintiff of "unsavory actions" and "inappropriate . . . practices" were protected statements of opinion because "what is 'unsavory' and 'inappropriate' to one person may be acceptable to another").

Moreover, Brown does not deny the truth of the factual bases for Defendants' accusations. Indeed, Brown expressly alleges that she did accept an investment from Hamilton, that Hamilton was her former client, that he was in his eighties at the time of his investment, and that a business deal with a former client raised the potential for conflict. The only part of Defendants' accusation Brown claims is false is Defendants' negative characterization of Brown's actions. However, "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 727 (7th Cir. 2004) (internal quotation marks omitted). And "[w]hen the facts underlying a statement of opinion are disclosed, readers will understand that they are getting the author's interpretation of those facts." *Black v. Wrigley*, No. 17 C 101, 2017 WL 8186996, at *7 (N.D. Ill. Dec. 8, 2017) (internal quotation marks omitted). Where, as here, there is no dispute as to the veracity of the factual statements, any accompanying expressions of opinion are non-actionable. *Skolnick v. Corr. Med. Servs., Inc.*, 132 F. Supp. 2d 1116, 1125–26 (N.D. Ill. 2001).

Brown also contends that Montgomery made defamatory statements about Brown in her response to Brown's ARDC complaint. "Otherwise defamatory material is . . . privileged if it arises 'during the course and as part of, a judicial proceeding if the matter has some relation to the proceeding.'" *Novoselsky v. Brown*, 822 F.3d 342, 353 (7th Cir. 2016) (quoting *Malevitis v. Friedman*, 753 N.E.2d 404, 406–07 (Ill. App. Ct. 2001)). The Seventh Circuit has found that this privilege applies to ARDC proceedings such that a defendant "cannot be subject to suit for any statements made directly to the ARDC." *Id.* at 353–54. But the privilege does not apply where the statements concerning the proceeding are made to third parties. *Id.* at 354. And here, Brown alleges that Defendants made statements to third parties consistent with those Montgomery made in her ARDC submission.

Although statements echoing those in Montgomery's ARDC submission are not privileged when made outside the relevant ARDC proceeding, they still fail to state a claim for defamation. Among other statements, Brown highlights Montgomery's assertion that Brown's conduct with respect to Hamilton was "highly suspect and certainly not within the spirit of the ethical rules," and her claims that Brown "mismanage[d] monies she unethically took/accepted from [Hamilton]," and "breach[ed] her fiduciary duty to her client." (Am. Compl., Ex. A, Dkt. No. 49-1.) Yet these statements simply consist of Montgomery's interpretation and subjective views of Brown's actions, and her submission details the facts that led her to those conclusions. Again, Brown fails to dispute the veracity of any of the facts set forth in Montgomery's submission and the facts Montgomery discloses in her submission are consistent with the amended complaint's allegations.

Thus, all the allegedly defamatory statements in the amended complaint are either time-barred, privileged, or non-actionable. For that reason, Brown's defamation claims are dismissed.

#### IV.     Intrusion Upon Seclusion and False Light

The Court next turns to Brown's claims for intrusion upon seclusion and false light, which are based on the same statements as those underlying her defamation claims. Both false light and intrusion upon seclusion are invasion-of-privacy torts. *Lovgren v. Citizens First Nat'l Bank of Princeton*, 534 N.E.2d 987, 988 (Ill. 1989). A false light claim is meant "to define and protect an area within which every citizen must be left alone." *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 210 (Ill. 1992). Similarly, "the core of [the intrusion upon seclusion] tort is the offensive prying into the private domain of another." *Acosta v. Scott Labor LLC*, 377 F. Supp. 2d 647, 650 (N.D. Ill. 2005) (quoting *Lovgren*, 534 N.E.2d at 989).

To state a false light claim, a plaintiff must allege that: (1) they were placed in a false light before the public as a result of the defendants' actions; (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (3) the defendants acted with actual malice, *i.e.*, with knowledge that the statements were false or with reckless disregard to the truth of their statements. *Kolegas*, 607 N.E.2d at 209–10. As discussed above, all the statements that supposedly placed Brown in a false light were either purely expressions of opinion or truthful factual statements accompanied by Defendants' subjective views of those facts. But "statements that are expressions of opinion devoid of any factual content are not actionable as false light claims." *Schivarelli v. CBS, Inc.*, 776 N.E.2d 693, 701 (Ill. App. Ct. 2002). Moreover, a false light claim cannot be maintained absent an allegation that some specific factual statement was false. *Salamone v. Hollinger Int'l, Inc.*, 807 N.E.2d 1086, 1093 (Ill. App. Ct. 2004) ("Plaintiff has failed to allege the most basic element of a false light cause of action: that the statement was false."). Consequently, Brown fails to plead a claim for false light and those claims are dismissed.

An intrusion upon seclusion claim requires a plaintiff to plead: "(1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) the intrusion must be offensive or objectionable to a reasonable person; (3) the matter upon which the intrusion occurs must be private; and (4) the intrusion causes anguish and suffering." *Schiller v. Mitchell*, 828 N.E.2d 323, 328 (Ill. App. Ct. 2005). The third element of the tort requires private facts to be alleged and has been described as "the predicate for the other three" elements. *Id.* (internal quotation marks omitted). "Without private facts, the other three elements of the tort need not be reached." *Id.* (internal quotation marks omitted). Private facts include "a person's financial, medical, or sexual life, or a peculiarly private fact of an intimate, personal nature." *Acosta*, 377 F. Supp. 2d at 650 (internal quotation marks omitted). In addition, a plaintiff must allege that she "attempted to keep private facts private." *Id.* The Court finds that the details of Brown's business relationship with Hamilton are not private facts. To the contrary, the vehicle for Hamilton's investment was Legacy Complete, a limited liability company registered in Nevada, and thus many of the details concerning Brown and Hamilton's business relationship are likely matters of public record. *Busse v. Motorola, Inc.*, 813 N.E.2d 1013, 1018 (Ill. App. Ct. 2004) ("Matters of public record . . . have been held not to be private facts."). In any case, the amended complaint is devoid of allegations as to how Brown attempted to keep any supposedly private facts private.

Furthermore, Brown fails to allege an unauthorized intrusion or prying into her seclusion. Liability for intrusion upon seclusion stems from the intrusion itself rather than any subsequent publication or disclosure. *In re Trans Union Corp., Priv. Litig.*, 326 F. Supp. 2d 893, 901 (N.D. Ill. 2004); *see also Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993) ("The tort of intruding upon the seclusion of another is aimed at discomfort caused by the intrusion itself . . . ."). Examples of an intrusion upon seclusion include "invading someone's home; an illegal search of

someone's shopping bag in a store; eavesdropping by wiretapping; peering into the windows of a private home; and persistent and unwanted telephone calls." *Lovgren*, 534 N.E.2d at 989.

Here, Brown fails to allege that any Defendant engaged in any such form of intrusion or prying. Instead, it appears as to Montgomery and Goldston that all information they obtained concerning Brown and Hamilton's business relationship came by virtue of their own involvement in that relationship—Montgomery being Hamilton's attorney and Goldston serving as his business manager—and their direct dealings with Brown. Insofar as Montgomery and Goldston learned any private facts, no intrusion was necessary; Brown knowingly and voluntarily disclosed those facts to them. *See, e.g.*, *Harman v. Gist*, No. 02 C 6112, 2003 WL 22053591, at *7 (N.D. Ill. Sept. 2, 2003) (dismissing intrusion upon seclusion claim where the defendant transcribed and disseminated a voicemail the plaintiff voluntarily left for the defendant). And the amended complaint alleges that Williams learned the details of Brown's relationship with Hamilton only indirectly, through Montgomery and Goldston. Nothing in the amended complaint supports even an inference of unauthorized prying on Williams's part.

In short, neither of Brown's privacy torts can be maintained. Her false light claim fails to plead an actionable false statement of fact and her intrusion upon seclusion claim fails to allege private facts or any intrusion by a Defendant. Thus, both the false light and intrusion upon seclusion claims are dismissed.

## V.     IIED

Brown also brings a claim for IIED, alleging that Defendants' conduct was extreme and outrageous. In Illinois, an IIED claim requires a plaintiff to allege: "(1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact

caused severe emotional distress." *Kolegas*, 607 N.E.2d at 211. "Extreme and outrageous" conduct is conduct that is "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Id.*

According to Brown, it was extreme and outrageous for Defendants to accuse her of taking advantage of her elderly former client because Defendants knew that such an accusation would be uniquely devastating to Brown's estate-planning law practice, given that the bulk of her clients were also senior citizens. It is difficult to accept that Defendants' criticism of Brown's business relationship with Hamilton rises to the level of extreme and outrageous conduct since Brown herself acknowledged that entering into a relationship with an elderly former client could give the appearance of impropriety. (*See* Am. Compl. ¶¶ 11, 13, 17, 19, 21.) While Brown denies that there was anything improper about her relationship with Brown, it was not outrageous for Defendants to claim otherwise. At most, Defendants' accusations amount to the type of "[m]ere insults, indignities, threats, annoyances, petty oppressions or trivialities" that are not actionable as IIED. *Cook v. Winfrey*, 141 F.3d 322, 331 (7th Cir. 1998) (internal quotation marks omitted). For that reason, Brown's IIED claims are dismissed.

## VI. Civil Conspiracy

Count VII of the amended complaint alleges that all Defendants were involved in a civil conspiracy to commit the various tortious acts alleged in Counts I–VI. However, a civil conspiracy claim "cannot stand where there are no underlying intentional torts that defendants could have conspired to perform." *Farwell v. Senior Servs. Assocs., Inc.*, 970 N.E.2d 49, 58 (Ill. App. Ct. 2012). Since each of Brown's individual tort claims have now been dismissed, her civil conspiracy claim must be dismissed as well. *See, e.g.*, *Estate of Brown v. Arc Music Grp.*, 830 F.

Supp. 2d 501, 510 (N.D. Ill. 2011) ("[The plaintiff] has failed to allege adequately any of the tort claims underlying the alleged civil conspiracy, so it cannot stand.").

## VII. Vicarious Liability

Finally, Count VIII of the amended complaint seeks to hold JPMorgan vicariously liable for Williams's conduct and the Firm vicariously liable for Montgomery's conduct. But since Brown has failed to plead any viable claim against Williams or Montgomery, there is no claim for which JPMorgan and the Firm can be held vicariously liable. *E.g.*, *Ross v. Univ. of Chi.*, No. 18-CV-4200, 2018 WL 6448464, at *10 (N.D. Ill. Dec. 10, 2018). Count VIII is therefore dismissed.

## VIII. Dismissal with Prejudice

Having dismissed all claims set forth in the amended complaint, the Court now considers Defendants' request that the amended complaint be dismissed with prejudice. The Seventh Circuit has stated that "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try and amend her complaint before the entire action is dismissed." *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 941 (7th Cir. 2018). While the amended complaint is not Brown's original complaint, her first filing was submitted *pro se* and this is the first time the Court has rendered a ruling dismissing any of her claims under Rule 12(b)(6). Thus, the Court will grant Brown an opportunity to amend her complaint if she believes that she can remedy the deficiencies identified in this opinion.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss (Dkt. Nos. 51, 52, 53, 63) are granted and the amended complaint is dismissed without prejudice. Brown shall have until April 4, 2022 to file a Second Amended Complaint that remedies the deficiencies discussed in this

opinion. If she fails to file a second amended complaint by that date, the dismissal will be deemed with prejudice.

ENTERED:

Dated: March 14, 2022

_____

Andrea R. Wood
United States District Judge