## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Kimberly Jean Brown,

        Plaintiff,

v.

Michelle Montgomery, et al.

        Defendants.

No. 20 CV 04893

Honorable Nancy L. Maldonado

## MEMORANDUM OPINION AND ORDER

Plaintiff Kimberly Jean Brown brings this suit asserting several common law tort claims against Defendants Lila Goldston, Michelle Montgomery, Erika Williams, the law firm James D. Montgomery & Associates, Ltd. (the "Firm"), and JPMorgan Chase Bank, N.A ("JPMorgan").[1] Defendants previously brought three separate motions to dismiss Brown's First Amended Complaint ("FAC") for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The Court granted Defendants' motions without prejudice and granted Brown leave to file a Second Amended Complaint ("SAC"), which she did on April 18, 2022. (Dkts. 73, 74.)[2] Defendants have, again, filed three motions to dismiss pursuant to Rule 12(b)(6) seeking dismissal of the SAC in its entirety. (Dkts. 78-80.) For the reasons stated in this opinion, Defendants' motions are granted, and the case is dismissed with prejudice.

---

[1] While the Second Amended Complaint names JP Morgan Chase Co. as a Defendant, JPMorgan contends that the proper Defendant is JPMorgan Chase Bank, N.A.

[2] In citations to the docket, page numbers are taken from the CM/ECF header.

## Background[3]

The Court laid out the factual background of this case in detail in its prior order dismissing the FAC. *See* (Dkt. 73); *Brown v. Montgomery, et al*, No. 20-CV-04893, 2022 WL 767254, at *1-4 (N.D. Ill. Mar. 14, 2022). The Court will repeat that background here from the allegations in the SAC, which supersedes all prior complaints and generally must be evaluated on its own terms without reference to any prior pleadings. *See Dunn v. Oak Lawn Police Dept.*, No. 18 C 1460, 2018 WL 11308709, at *2 (N.D. Ill. Apr. 27, 2018) (citations omitted).

Brown is a licensed attorney in Illinois whose practice was focused on estate planning for middle- and low-income clients. (Dkt 76 ¶ 4.) During her years focusing on estate planning, many of Brown's clients were referred to her by employees of a Chicago branch of JPMorgan, including by Defendant Erika Williams, a (now former) JPMorgan financial advisor. *Id.* ¶ 7. Williams introduced Brown to Dr. Charles Hamilton, a prominent political scientist and civil rights leader who was Williams's client. *Id.* ¶ 9. After Brown completed some estate-planning work for Hamilton, he took Brown on as a mentee and the two became close friends. *Id.* ¶¶ 10-11.

Prior to meeting Hamilton, Brown had begun developing a business plan to create a software program to make estate and trust planning resources more accessible and affordable for middle- and lower-income individuals. *Id.* ¶ 14. By February 2015, it became evident to Brown that she needed to raise additional capital to finish the project. *Id.* ¶ 16. Hamilton learned of Brown's efforts to raise capital and offered to donate $25,000, which was the full amount Brown was seeking as a gift. *Id.* ¶ 17. Brown declined the offer due to her concerns about doing business with a former client and because of Hamilton's advanced age. *Id*

---

[3] The Court takes the factual background from the allegations in the SAC, (Dkt. 76), and assumes the allegations to be true for the purposes of the instant motion. *See Lewert v. P.F. Chang's China Bistro*, Inc., 819 F.3d 963, 966 (7th Cir. 2016).

Hamilton asked Brown to discuss her project with Defendant Lila Goldston, whom Hamilton introduced as his business manager. *Id.* ¶ 18. Although Brown was still reluctant to receive a large gift from a former client, she made a formal presentation to Goldston about her business plan as Hamilton requested. *Id.* ¶ 19. During the presentation, Goldston provided substantive feedback including recommending that Brown scrap the current software code she had begun developing and utilize a software developer in the United States. *Id.* ¶ 20. Goldston also requested that Brown prepare a new budget that reflected these changes. *Id.* After the presentation, Brown determined that she would need $125,000 in capital to implement Goldston's recommendations. *Id.* ¶ 21.

Brown gave an additional presentation, after which Goldston stated that Hamilton wished to invest the entire $125,000 needed for the venture. *Id.* ¶ 22. Goldston proposed that Brown create a new business entity for her venture in which Hamilton would have a 25% ownership share. *Id.* Goldston further insisted that Brown agree not to seek additional investors without first obtaining Hamilton's approval. *Id.*

Brown remained hesitant to partner with Hamilton due to his advanced age and to avoid the appearance of impropriety. *Id.* ¶ 23. Brown discussed her concerns with Goldston and Hamilton, provided Goldston with a memorandum of understanding outlining her concerns, and asked Goldston to discuss those issues with Hamilton privately. *Id.* ¶ 24. Goldston ultimately persuaded Brown to accept Hamilton's offer, based on assurances that Hamilton's investment was consistent with his history of investing in female-owned businesses. *Id.* ¶¶ 26-27. To allay Brown's concerns, Hamilton and Brown signed the memorandum of understanding she had provided Goldston. The memorandum included a provision stating that Hamilton "has independently sought

legal advice" regarding his investment. (Dkt. 76-2.)[4] Additionally, Brown insisted that the deal include several terms. (Dkt. 76 ¶ 28.) First, Brown would communicate with Goldston rather than Hamilton about business matters. *Id.* Second, Hamilton would be prohibited from hiring Brown as an attorney in the future. *Id.* Third, Hamilton would not invest the $125,000 as a lump sum but instead would invest only the amount needed each month, subject to Goldston's review and approval of the company's monthly expenditures. Fourth, Brown would hold monthly progress meetings to update Goldston and Hamilton on the business's progress. *Id*

On May 14, 2015, Brown formed a new Nevada limited liability company called Legacy Complete ("Legacy"). *Id.* ¶ 29. Brown chose Nevada because of its favorable LLC laws. *Id.* Hamilton's trust received a 25% ownership interest in Legacy, with the remaining 75% held by Brown's family's trust. *Id.* Goldston and Brown approved the company's operating budget, which provided that Brown would initially receive a $100,000 annual salary, plus bonuses, in return for her work as manager of Legacy. *Id.* ¶ 30. Brown alleges she entered into an employment agreement with Legacy that memorialized her $100,000 salary. *Id.*

Not long after forming the company, Brown noticed the relationship between Goldston and Hamilton changed in a number of ways that concerned Brown. *Id.* ¶ 35. Specifically, Brown observed that Goldston began to ignore Hamilton's wishes, and that it appeared Goldston was asserting more control over Hamilton's finances, healthcare, and with whom he interacted. *Id.* ¶ 35. According to Brown, Goldston suggested that she was willing to sacrifice Hamilton's investment in Legacy if it furthered her own purposes. *Id.* Brown raised her concerns with both Goldston and Hamilton and requested that Hamilton protect his interests by retaining an attorney

---

[4] The memorandum is attached as an exhibit to the complaint, and therefore is incorporated as part of the pleading for all purposes. See Fed. R. Civ. P 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

to work with Goldston. *Id.* ¶ 36. Brown further asked Hamilton to agree to sell his ownership interest in Legacy or convert it into a loan, which would allow Legacy to raise additional capital. *Id.* ¶ 37. Hamilton agreed to work toward converting his investment into a loan. *Id.* To effectuate both of Brown's requests, Hamilton retained Defendant Michele Montgomery, a partner at the firm James D. Montgomery & Associates, Ltd. *Id.* ¶ 38.

Right away, Montgomery and Brown had a hostile relationship, with Brown claiming that Montgomery was antagonistic and accusatory toward her. *Id.* ¶ 39. Montgomery said that her job was, according to Goldston, to "clean up" Brown's mess. *Id.* In October 2015, Brown provided a draft of loan conversion documents to Montgomery, and Montgomery asked Brown to be a guarantor for the note, to which Brown agreed. *Id.* ¶ 40. However, after Brown reviewed the draft guaranty prepared by Montgomery, Brown told her she was unwilling to sign unless certain changes were made. *Id.* ¶ 41. Brown and Montgomery ultimately reached an impasse on the terms of guaranty and conversion of Hamilton's investment into a loan. *Id.* According to Brown, the impasse was because Montgomery insisted on onerous terms to which Brown could not agree. *Id.*

In the meantime, Brown continued working with software developers to build the Legacy application. *See id.* ¶ 44. Brown initially hired a Chicago-based developer in June 2015, paying a deposit of $15,000 with the goal of delivering the Legacy application by November 2015. *Id.* However, after several months of technical issues and delays, the developer contacted Brown and informed her it would not complete the application and would not return the $30,000 Legacy had paid up to that point. *See id.* ¶¶ 44-55. Brown declined to pursue legal action against the developer and instead hired another firm to patch the code for the application that had been developed so that it could be released. *Id.* ¶ 56. The new developer determined, however, that it would need to redesign the code from scratch. *Id.* ¶ 58. Brown advised the new developer that Legacy no longer

had the funds to start a redesign project from scratch. *Id.* According to Brown, the new firm indicated that it had an interested investor who they wanted Brown to contact. *Id.* ¶ 60 The firm also indicated it would be willing to enter into a joint venture partnership with Legacy if the investor did not materialize. *Id.*

Around August 2015, Brown began discussing Legacy's need for additional capital with Goldston. *Id.* ¶ 63. Brown alleges that Goldston and Montgomery counseled Hamilton not to invest additional capital in the business, to refuse to allow Brown to seek outside investors, and to refuse to take out, or make, a loan. *Id.* Hamilton followed Goldston's and Montgomery's advice and did not provide additional capital, and refused to make or allow a loan, or to allow additional investors. *Id.* ¶ 65. Brown depleted her savings and took out personal loans to replace the salary she was not receiving from Legacy. *Id.* ¶ 66. But ultimately, Legacy ran out of operating capital. *Id.* ¶ 61. Because Brown was prohibited from securing additional investors, Legacy entered into a joint operating agreement with the new software developer. *Id.* However, while the developer completed the application in August 2016, it breached the joint venture agreement and advised it was keeping control of the application. *Id.* ¶ 62. Brown states that she sued and secured a judgment against the company but has been unable to collect on it. *Id.* Legacy was administratively dissolved in May 2017. *Id.* ¶ 66. In the two years working for Legacy, Brown alleges she received little more than $10,000 in net compensation, far less than the $200,000 she was due, and was forced to sell her home. *Id.* ¶ 67.

In 2020, Brown filed a complaint with the Illinois Attorney Review and Discipline Commission ("ARDC") requesting a review of both her and Montgomery's actions in relation to Legacy. *Id.* ¶ 68. The ARDC ultimately concluded that Brown's conduct did not warrant any investigation. *Id.* During the ARDC proceedings, Brown states she became aware of false

representations that Montgomery and Goldston had been making. *Id.* ¶ 69. Specifically, Brown contends that Montgomery's submissions to the ARDC included several false and damaging representations, including, for example, that: (1) Brown improperly accepted $125,000 from Hamilton despite his advanced age; (2) Brown misused Hamilton's personal financial information obtained as part of her representation of him to his disadvantage; (3) Brown's actions were "highly suspect and certainly not within the spirit of the ethical rules" governing attorneys; (4) Brown attempted to illegally amend the operating agreement she had entered into with Hamilton; and (5) Brown mismanaged and misused the monies that she "unethically took/accepted" from Hamilton. *Id.* Brown further contends that Montgomery's engagement letter with Hamilton, which was attached to the ARDC letter, included additional false statements which Brown believes were provided by Goldston. *Id.* ¶ 70. Those false statements include a claim that Hamilton did not have attorney representation during his investment, that Hamilton hosted several dinners with Brown and others to discuss the investment into Legacy, and that Hamilton did not pay Brown for her legal services. *Id.* Brown claims that these false statements in the ARDC report and engagement letter are "illustrative" of false statements Goldston and Montgomery also made to third parties. *Id.* ¶¶ 69-70.

Brown asserts on information and belief that Montgomery and Goldston made one or more of the false representations discussed above to third parties, including Hamilton, ARDC individuals, Hamilton's accountant, Williams and other employees at JPMorgan, and other attorneys at Montgomery's firm. *Id.* ¶ 75. Brown states on information and belief that Williams then repeated the false accusations to former clients of Brown, to prospective clients, and to other JPMorgan employees. *Id.* ¶ 76. As an example, Brown states she met with a former client that had been referred from JPMorgan, and while the client had always been friendly in the past, the client

was now upset with Brown, which she attributes to this client being falsely told that Brown had taken advantage of Hamilton. *Id.* ¶ 77 Brown also points to Hamilton's accountant being "rude and dismissive" to her, which she attributes to the accountant being told false statements about Brown's conduct by Goldston, Montgomery, and/or Williams. *Id.* ¶ 78.

Based on the above allegations, Brown filed the present action against Defendants claiming that their conduct damaged her reputation and caused her to suffer financial loss from the failure of Legacy and the loss of clients for her estate-planning law practice. Count I of the six-count amended complaint asserts a claim against Goldston and Montgomery for tortious interference with a contractual relationship. Counts II asserts a claim for tortious interference with prospective business relations against Williams. Counts III, V, and VII assert claims for defamation, false light, and civil conspiracy against Goldston, Montgomery, and Williams.[5] Count VIII asserts vicarious liability against the Firm and JPMorgan, based on the actions of Montgomery and Williams.

### Legal Standards

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A

---

[5] Brown indicates that she has removed Counts IV (intrusion on seclusion) and VI (intentional infliction of emotional distress) from the FAC in response to the Court's order dismissing those claims. Brown has left the numbering of her remaining counts the same, hence the gaps in the numbering of the counts in the SAC.

claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Discussion

### A. Tortious Interference with a Contractual Relationship against Goldston and Montgomery

Count I of the SAC asserts a claim against Goldston and Montgomery for tortious interference with a contractual relationship. (Dkt 76 ¶¶ 85-88.) To state a claim for tortious interference with a contractual relationship in Illinois,[6] a plaintiff must plead: "(1) the existence of a contract; (2) the defendants' awareness of the contract; (3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages." *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 676 (Ill. 1989)).

In the FAC, Brown alleged that Goldston and Montgomery induced Hamilton to breach Legacy's operating agreement by persuading him to withhold additional capital and deny Brown permission to seek outside investments. (*See* Dkt. 72 at 8.) The Court rejected this claim, holding that there was nothing in the Legacy operating agreement that required Hamilton to provide additional support or take any particular action should he refuse to approve outside investments in the company. *See* (Dkt. 73 at 10.); *Brown*, 2022 WL 767254 at *5.[7] The Court thus found that Brown had failed to adequately plead the "breach" element of the cause of action, because she

---

[6] The parties agree Illinois substantive law applies to all of Plaintiff's claims.

[7] To the contrary, the Court observed that the operating agreement provided that no Legacy member "shall be obligated to make any additional contribution to the Company's capital." *Id.*

failed to allege that Hamilton breached any obligation under the operating agreement irrespective of Goldston's and Montgomery's alleged inducement. *Id.*

In the SAC, Brown's theory has shifted, and she now alleges that Goldston and Montgomery interfered with Brown's employment agreement with Legacy. Specifically, Brown contends that Goldston and Montgomery knew that if Hamilton refused to address Legacy's need to raise capital, the company would fail and be unable to meet its obligations, including its obligation to pay Brown the compensation she was owed under her employment agreement. (Dkt. 76 ¶¶ 86–87.) Brown alleges that Goldston and Montgomery intentionally prevented Legacy from raising the capital it needed by using their relationships with Hamilton to induce him to refuse to donate additional capital or allow additional investors, and that due to Goldston's and Montgomery's actions, Legacy failed to pay Brown the amount she was owed under her employment agreement. *See id.* ¶¶ 64–65, 86–87.

Montgomery argues that Brown's claim must fail because she does not plead facts establishing that Montgomery unlawfully induced Legacy to breach its contract. (Dkt. 80 at 7–8.) Montgomery notes that Brown is not alleging that Montgomery or Goldston targeted Legacy, but rather is claiming that Montgomery and Goldston counseled Hamilton to take certain actions that ultimately led to the failure of Legacy, which in turn caused Legacy to breach its contract with Brown. *Id.* Montgomery contends that Illinois law does not support this kind of "indirect, down-stream inducement" theory, and claims it is not enough that Montgomery and Goldston may have "created a condition that opened the way" for Legacy's ultimate breach of its employment agreement with Brown. *Id.* (citations omitted). Goldston, largely repeating her arguments from her prior motion to dismiss, further argues that there can be no tortious interference where Hamilton acted within his rights under the Legacy operating agreement. (Dkt. 78 at 9–12.) In other words,

Goldston argues that Hamilton was not obligated to take any particular action, such as making further investments or allowing for additional investors in Legacy, and therefore argues that she cannot be liable for advising Hamilton to do what he was permitted to do.[8]

Brown does not address Montgomery's contention that she is attempting to bring a "downstream" inducement theory of liability that Illinois courts have previously rejected. Instead, Brown simply claims that there was "no plausible business justification" for Montgomery and Goldston's actions in convincing Hamilton not to allow more investors, and the result of that interference was predictable: Legacy failed and breached its obligations to compensate Brown. (Dkt. 81 at 3.) Brown further argues that it is irrelevant that Hamilton was not required to invest more money or allow for additional investors under the Legacy operating agreement because that agreement "is no longer the basis of [Brown's] claim." (Dkt. 81 at 4.)

The Court agrees with Montgomery and Goldston that Brown fails to state a claim against them for tortious interference with contract. In particular, the Court finds that Brown has failed to plead the "intentional inducement of a contract breach" element of her cause of action. "Intent to induce 'requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way.'" *Webb v. Frawley*, 906 F.3d 569, 579 (7th Cir. 2018) (quoting *In re Est. of Albergo*, 656 N.E.2d 97, 103 (Ill. 1995)); *see also* Restatement (Second) of Torts § 766 cmt. h (Am. L. Inst. 1979) ("The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other."). Inducement

---

[8] Montgomery and Goldston raise several other arguments for dismissal. For example, Montgomery argues that Brown has only alleged, at most, an at-will contract between her and Legacy, which Montgomery maintains cannot give rise to a claim for tortious interference with contract. (Dkt. 80 at 7–8.) Montgomery further maintains that any advice to Hamilton was privileged and cannot subject her to liability. *Id.* Goldston additionally argues in the alternative that Brown's complaint should be dismissed for failure to join Hamilton as a necessary party. (Dkt. 78 at 8–9.) Because the Court ultimately finds that Brown has failed to state a claim, it need not address these other arguments for dismissal.

thus "requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another." *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 802 (N.D. Ill. 2011) (citing *R.E. Davis Chem. Corp. v. Diasonics, Inc*., 826 F.2d 678, 687 (7th Cir. 1987), *modified on other grounds*, 924 F.2d 709 (7th Cir. 1991)). Rather, in order to survive a motion to dismiss, a plaintiff must show that the defendant "*intended* to cause the breach" at issue. *See Webb*, 906 F.3d at 579 (emphasis added).

Brown here fails to plead any facts demonstrating that Montgomery and Goldston intended, through active and direct persuasion, to cause Legacy to breach its employment agreement with Brown. Brown does not allege that Montgomery and Goldston induced Hamilton with the intent of causing Legacy to breach its agreement with Brown. Instead, Brown merely contends that Montgomery and Goldston induced Hamilton, who was not a party to Legacy's agreement with Brown, to undertake certain actions that "predictably" resulted in Legacy failing, which subsequently caused Legacy to breach its agreement with Brown. (Dkt. 76 ¶ 87.) Brown's allegations therefore suggest that Legacy's collapse and failure to pay her a salary was, at most, a ripple effect of Montgomery and Goldston's actions. But as Montgomery notes in her motion, in order to state a claim for tortious interference with a contract, it is not enough for a plaintiff to allege that a defendant "merely created a condition that opened the way" for a breach, or that the defendant engaged in conduct that had a "downstream" impact on a plaintiff's contract. *See Cohen v. Lewis*, No. 03-CV-5454, 2004 WL 2481015, at *7 (N.D. Ill. Nov. 3, 2004) (citing *Servpro Industries, Inc. v. Schmidt*, No. 94C 5866, 1997 WL 158316, at *16 (N.D. Ill. Mar. 31, 1997)); *see also Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19 CV 7092, 2021 WL 83550, at *5 (N.D. Ill. Jan. 11, 2021) ("[Plaintiff's] allegations suggest that [defendant's] conduct had a downstream impact on [plaintiff's] customer contracts, but [plaintiff] has to allege more than a ripple effect to state a

claim for tortious interference."). Instead, as noted above, Brown must allege that the defendants "intended to cause the breach," which she has failed to do. While Montgomery and Goldston's alleged inducement of Hamilton may have created a condition—a lack of capital—that "predictably" opened the way for Legacy to fail and breach its employment agreement with Brown, this alleged "ripple effect" is insufficient to state a claim that Montgomery and Goldston interfered with the intent to cause a breach of Brown's contract with Legacy. *See id.*; *Cohen*, 2004 WL 2481015 at *7; *Life Spine, Inc.*, 2021 WL 83550,at *5.

Brown notably does not advance any argument in response to this aspect of Montgomery's argument. Brown also fails to cite any caselaw suggesting that a party can be held liable for tortious interference with a contract when they induce one individual to take certain actions that create certain conditions that eventually lead to a breach of contract between two other parties. In the absence of any authority or argument to the contrary then, Brown's claim for tortious interference with contract fails.

This would be the result even if, as Brown alleges, Montgomery and Goldston acted with the express intent of preventing Legacy from raising capital. It may be that Montgomery and Goldston knew that, by intentionally advising Hamilton to prevent Legacy from raising more capital, it was "substantially certain" that Legacy would fail and breach its agreement. But again, such knowledge that a breach of contract is "substantially certain" to occur is insufficient to state a claim for tortious interference. *See Pampered Chef*, 804 F. Supp. 2d at 802 (citations omitted). It is also not enough for Brown to claim that Montgomery acted as part of a general scheme to defame and otherwise harm Brown. *See Wells Fargo Bank, N.A. v. Worldwide Shrimp Co.*, No. 17 CV 4723, 2019 WL 4189480, at *8 (N.D. Ill. Sept. 4, 2019) ("A general intent to harm . . . is not enough."). In order to state a claim, Brown is required to allege that Montgomery and Goldston

acted with the specific intent of inducing Legacy to breach its employment agreement with Brown. *See id.* at 7 –8 (citations omitted); *R.E. Davis Chem. Corp.*, 826 F.2d at 685 (affirming dismissal of tortious interference with a contract claim where complaint "did not allege that the doctors *intended* to induce [the third party] to breach its contract with [plaintiff]."). Brown, however, has made no such claim that Montgomery and Goldston intended for Legacy to breach its agreement.

Finally, it is important to note that Brown has essentially conceded that Hamilton acted within his rights under the Legacy operating agreement, and that concession drastically undercuts any suggestion that Montgomery and Goldston committed a tort in how they advised him. It may be true, as Brown claims, that Hamilton's actions in not allowing for additional funding from outside investors, not investing additional capital in Legacy himself, and not converting his investment into a loan, lacked any "plausible business justification." But regardless of the justification for these actions taken at Montgomery and Goldston's alleged inducement, Brown has dropped any suggestion that Hamilton breached the operating agreement with Legacy in taking them, nor does she claim that he is liable for Legacy's ultimate failure. It would be an exceedingly strange result if Montgomery and Goldston could expose themselves to tort liability for inducing Hamilton to take actions which he was contractually authorized to take, and which did not expose him to any liability, even if those actions may have inevitably led to the failure of Legacy. After all, Brown, who is an attorney and a sophisticated party, expressly agreed to the conditions that Hamilton was not obligated to invest anything beyond his initial $125,000 contribution, and that he had the right to refuse any other investors. In so doing, Brown should have anticipated the possibility that no further capital would be available for Legacy beyond the initial investment, which might impact her employment agreement. At the very least, the fact that Brown agreed to the terms of the operating agreement significantly undercuts her claims that Montgomery and

14

Goldston's advice to Hamilton to act within those same terms lacked any "plausible" justification and was done with tortious intent.

In sum, the Court finds that Brown has failed to sufficiently allege the intentional inducement of a contract breach element of her claim for tortious interference with contract against Montgomery and Goldston. Count I is therefore dismissed.

## B. Tortious Interference with Prospective Business Relations.

Count II of the SAC asserts a claim against Defendant Williams for tortious interference with prospective business relations. (Dkt. 76 ¶¶ 89–92.). Brown claims, on information and belief, that Williams falsely represented to Brown's past and prospective clients that Brown improperly took advantage of an elderly client—Hamilton. *Id.* ¶ 90. Brown alleges that she had a reasonable expectation that the prospective clients Williams spoke to would retain Brown, based on the "sterling reviews" Brown had received in the past from clients referred to her from JPMorgan. *Id.* ¶ 91. Brown claims that Williams would have been aware of Brown's sterling reputation, and that Williams thus knew or should have known the representations about her taking advantage of Hamilton were false. *Id.* ¶¶ 9 –92. Brown claims these false representations interfered with Brown's ability to secure work from prior clients and new work with prospective clients, and that the damage to her professional reputation affected her ability to attract clients from other sources. *Id*.

A claim for tortious interference with prospective business relations requires the plaintiff to allege: "(1) a reasonable expectation of entering into a valid business relationship, (2) the defendant's knowledge of the expectation, (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship, and (4) damage to the plaintiff resulting from the defendant's interference." *Atanus v. Am. Airlines,*

*Inc.*, 932 N.E.2d 1044, 1048 (Ill. App. Ct. 2010) (citations omitted). Just like a tortious interference with contract claim, this cause of action is a "purposely caused tort," meaning that the plaintiff "must set forth facts which suggest that defendant acted *with the purpose* of injuring plaintiff's [business] expectancies." *Gavin/Solmonese LLC. v. Kunkel*, No. 16-CV-1086, 2016 WL 3612123, at \*9 (N.D. Ill. July 6, 2016) (citations omitted); *see also Dutch Valley Growers, Inc. v. Rietveld*, No. 16-2085, 2016 WL 10789393, at \*7 (C.D. Ill. Aug. 29, 2016) ("To be held liable for tortious interference with a business expectancy, one must have taken some wrongful action, directed at a third party, to induce the third party not to do business with the plaintiff.") (citation omitted); *McIntosh v. Magna Sys., Inc.*, 539 F. Supp. 1185, 1193 (N.D. Ill. 1982) ("the tort of intentional interference with a prospective business opportunity requires that plaintiff allege some conduct directed toward a third party through which defendants purposely cause that third party not to enter into or continue a prospective contractual relationship with plaintiff.") (collecting cases).

In her motion to dismiss, Williams argues that the SAC relies on the same "attenuated allegations" that led the Court to previously dismiss the same count in the FAC. (Dkt. 79 at 3.) In particular, Williams argues that Brown has again failed to allege that Williams purposefully directed interfering conduct toward a third-party, and that Brown's conclusory allegations regarding William's state of mind do not plausibly suggest that Williams acted with the requisite "intent to harm." (Dkt. 79 at 2.) In response, Brown argues that she sufficiently alleged that Williams made statements to prospective and former clients that she knew were false, and that it 'is "reasonable to infer" from her conduct that Williams had a desire to harm Brown's interests. (Dkt. 81 at 7–8.)

The Court agrees with Williams that the allegations in the SAC are insufficient to establish that Williams directed conduct towards past and future clients to purposely interfere with Brown's

prospective business relationships. As a threshold manner, the Court notes the conclusory and speculative nature of Brown's new allegations in the SAC. In its prior ruling, the Court dismissed the tortious interference with business relationship claim against Williams in part because Brown had failed to allege that Williams had any involvement in Montgomery and Goldston's alleged misconduct with Legacy or Hamilton's investments, and because Brown did not allege that Williams knew the statements she was repeating from Montgomery and Goldston about Brown taking advantage of Hamilton were false. (Dkt. 73 at 13); *Brown*, 2022 WL 767254 at *6 –7. In the SAC, Brown now asserts in a conclusory fashion that Williams "knew or should have known" the representations about Brown were false, because Williams "was aware of [Brown's] reputation for integrity and sterling track record," and "should have known that any statements challenging Ms. Brown's integrity were false." (Dkt. 76 ¶¶ 80, 90.) While the Court must generally accept well-pled allegations as true, it need not "credit allegations that are merely conclusory and speculative." *See Nowicki v. Delao*, 506 F.App'x 514, 517 (7th Cir. 2013); *Twombly*, 550 U.S. at 555 (instructing that the allegations of the complaint "must be enough to raise a right to relief above the speculative level").

Brown's allegations that Williams knew (or should have known) her statements were false, because she was aware of Brown's "sterling" reputation, strike the Court as highly speculative and insufficient to state a claim even under liberal pleading standards. The Court is not persuaded that a party must know that any negative statement about another person's integrity must be false, merely because that party knows the other person to generally be one of integrity. Williams had no involvement with Brown's interactions with Hamilton, Montgomery, or Goldston with respect to the formation and operation of Legacy, and the mere fact that she knew Brown to be a person of "integrity" does not create a reasonable inference that she must have known any statements

about Brown's alleged misconduct in the context of Legacy were false. Thus from the start, Brown's claim that Williams' repeated false statements to past and future clients rests on highly speculative and conclusory grounds.

Even if the Court accepts as true Brown's conclusory allegations that Williams repeated what she knew or should have known were false accusations, Brown's claim against Williams still fails because she does not allege that Williams made false statements with the express intent or purpose of causing potential clients to refuse to do business with Brown. In *Gavin/Solmonese*, for example, the plaintiff, a management consultant firm, brought suit against a former employee for several common law torts, including tortious interference with contract and prospective economic advantage, based on allegations that the defendant interfered with the plaintiff's contract and prospective business relationship with a customer. 2016 WL 3612123 at *1. In particular, the plaintiff alleged that the defendant, who was selected by the plaintiff to serve as an interim chief executive officer at a customer's business, engaged in misconduct and inappropriate activities that ultimately led the customer to terminate its agreement with the plaintiff. *Id.* at *2–3. The plaintiff alleged that the defendant was liable for intentional interference with the plaintiff's contract and prospective business relationships because he engaged in conduct which he "knew or should have known" would cause the customer to terminate its agreement with the plaintiff, and deprive the plaintiff of a valuable referral source and future business opportunities. *Id.* at *7–8. The court noted, however, that both causes of actions are "purposely caused tort[s]," meaning that the plaintiff needed to set forth facts showing that it was the defendant's intent to cause the particular result. *Id.* at 8–9. In the context of an interference with prospective economic advantage claim, this meant that the plaintiff was required to set forth facts which suggest that defendant acted "with the purpose of injuring the plaintiff's expectancies." *Id.* at *9 (citations omitted). The court found that

the plaintiff's allegations that defendant "knew or should have known" his conduct would interfere with the plaintiff's contract and prospective economic advantage were insufficient to establish that the defendant "purposefully caused" a breach of contract or that he acted "with the purpose" of injuring the plaintiff's business expectancies. *Id.*

As in *Gavin/Solmonese*, the Court finds that Brown's allegations are insufficient to show that Williams acted with the express purpose of interfering with Brown's prospective business relationship. Brown does not allege that Williams acted with the express purpose of interfering with Brown's prospective relationships with past or future clients. Instead, Brown merely suggests that it is a "reasonable inference" that Williams made her statements with the requisite intent to harm because Williams made statements that she knew or should have known to be false. (Dkt. 81 at 7–8.) But the Court finds this suggestion to be akin to alleging that Williams "knew or should have known" that her false statements would interfere with Brown's business, which is not sufficient to show that Williams acted with the *purpose* of interfering with Brown's business. *See Gavin/Solmonese* 2016 WL 3612123 at 8–9; *see also cf. Weiss v. Logan Cnty. Cemetery Maint. Dist.*, No. 3:19-CV-3118, 2019 WL 4783096, at *2 (C.D. Ill. Sept. 30, 2019) (holding that plaintiff stated a claim for intentional interference with prospective economic advantage, where the plaintiff alleged that a local county board selectively enforced permitting procedures against the plaintiff "solely for the improper and illegitimate purpose of driving [plaintiff] out of business."). While the Court must draw all "reasonable inferences" in Brown's favor, Brown must still allege sufficient facts to establish all the elements of her claims. *See In re Dealer Mgt. Sys. Antitrust Litig.*, No. 18-CV-864, 2019 WL 4166864, at *11 (N.D. Ill. Sept. 3, 2019); *Iqbal,* 556 U.S. at 678 ("[a] claim has facial plausibility when the plaintiff pleads factual content that *allows the court to*

*draw the reasonable inference* that the defendant is liable for the misconduct alleged.") (emphasis added).

The Court ultimately concludes that the mere allegation that Williams repeated statements that she "knew or should have known" were false is insufficient to create the reasonable inference that Williams acted with the requisite intent to interfere with Brown's prospective business relationships. Brown has thus failed to plead a required element of her claim, and Count II for tortious interference with business relationship against Williams must be dismissed.

### C. Defamation

In Count III of the SAC, Brown brings claims for defamation against Goldston, Montgomery, and Williams. (Dkt. 76 ¶ 94.) Brown asserts that these three Defendants each made false statements to third parties that Brown had taken advantage of Hamilton, and that those statements caused significant harm to Brown's reputation and career. *Id.*

To state a defamation claim, a plaintiff must allege facts showing: (1) a false statement by the defendant about the plaintiff; (2) the defendant made an unprivileged publication of that statement to a third party; and (3) that publication caused damages. *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839 (Ill. 2006). There are two recognized types of defamatory statements in Illinois: defamation *per se* and defamation *per quod*. *Naleway v. Agnich*, 897 N.E.2d 902, 908 (Ill. App. Ct. 2008). A defamatory statement is actionable *per se* where "its harm is obvious and apparent on its face." *Solaia Tech.*, 852 N.E.2d at 839. Illinois recognizes five categories of statements considered defamatory *per se*:

> (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication.

*Id.* On the other hand, a statement may be defamatory *per quod* where the statement is either "defamatory on its face, but does not fall within one of the limited categories of statements that are actionable per se" or not defamatory on its face but can be shown to have injurious meaning by resort to extrinsic evidence. *Bryson*, 672 N.E.2d at 1221. As with the FAC, Brown does not specify whether she is pleading defamation *per se* or *per quod.* As the Court did in its prior order, it will construe her claim here as one for defamation *per se*, because the alleged defamatory statements suggest that Brown failed to perform her duties as an estate-planning attorney with integrity or they otherwise prejudiced her in that profession. *See Brown*, 2022 WL 767254 at *7.

The Court previously dismissed Brown's defamation claim against Goldston, Montgomery, and Williams finding that some of the allegedly defamatory statements were time-barred, and for those that were not obviously time-barred, the statements were protected statements of opinion. (Dkt. 73 at 18); *Brown*, 2022 WL 767254 at *7–8. In particular, the Court noted that the First Amendment may protect statements which may be defamatory *per se* as expressions of opinion. *Brown*, 2022 WL 767254 at *8 (citing *Solaia Tech*., 852 N.E.2d at 839 ("Specifically, the [F]irst [A]mendment prohibits defamation actions based on loose, figurative language that no reasonable person would believe presented facts."). As the court in *Solaia Tech* explained, "a defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact." *Id.* Among the factors to be considered are "whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Id*. Applying these factors and authority, the Court held that "the unadorned statement that Brown took advantage of Hamilton is a protected statement of opinion because it does not have a precise and readily understood meaning, nor is it objectively verifiable." *Brown*, 2022 WL 767254 at *9. The Court proceeded to

note that, "[a]bsent a specific factual context, there is no objective way of knowing whether Brown took advantage of Hamilton and the statement is instead purely an expression of opinion regarding their business relationship." *Id.*

To the extent that Defendants were providing their subjective opinion based on a certain factual context, the Court found it notable that Brown did not "deny the truth of the factual bases for Defendants' accusations." *Id.* Rather, "[t]he only part of Defendants' accusation Brown claims is false is Defendants' negative characterization of Brown's actions." *Id.* But the Court noted that when there is no dispute as to the veracity of the factual statements, any accompanying expressions of opinion are non-actionable. *Id.* (citing *Skolnick v. Corr. Med. Servs., Inc.*, 132 F. Supp. 2d 1116, 1125–26 (N.D. Ill. 2001)). Finally, to the extent that Brown alleged that Montgomery and the others repeated false statements that appeared in Montgomery's ARDC submissions, the Court again found that Montgomery's assertions "simply consist of Montgomery's interpretation and subjective views of Brown's actions, and her submission details the facts that led her to those conclusions." *Id.* at 10. As Brown did not challenge the veracity of any facts in Montgomery's ARDC submissions, her claim for defamation based on Montgomery's subjective opinions failed. *Id.*

In their renewed motions to dismiss, Montgomery, Goldston, and Williams argue that Brown's SAC fails to remedy any of the deficiencies that led to the dismissal of the FAC. Indeed, Brown's overarching claim that Defendants told others that she "took advantage" of Hamilton is the same claim that the Court previously found constituted a protected statement of opinion, because it did not have a precise and readily understood meaning, nor was it objectively verifiable. *Brown*, 2022 WL 767254 at *9. Thus, on first glance, Brown's SAC suffers from the same flaw that led the Court to previously dismiss her defamation claim.

In her response brief, Brown argues that the SAC adds additional allegations demonstrating that Defendants made false statements of objectively verifiable fact underlying their opinion that she took advantage of Hamilton, which would make their statements actionable. (Dkt. 81 at 8.) Brown cites four examples in particular that she claims are false statements of verifiable fact: (1) Montgomery falsely stated to the ARDC that Brown and Hamilton's transaction "violated Illinois' Supreme Court Rule of Professional Conduct 1.9(c)(1)," which states that an attorney shall not use a former client's financial information learned in the course of representation to the client's disadvantage; (2) Montgomery falsely stated to the ARDC that Brown's actions were "suspect" because Hamilton "never paid Brown for her estate planning work," when in fact Hamilton did pay Brown; (3) Montgomery falsely stated to the ARDC that Brown "stalled negotiations" over converting Hamilton's investment to a loan, where it was Montgomery who stalled negotiations; and (4) Montgomery falsely stated in her engagement letter with Hamilton that he did not have an attorney advise him on his Legacy investment, where Hamilton signed a memorandum of understanding indicating he had an attorney review his investment. *See id*. While Brown acknowledges that Montgomery's statements to the ARDC are privileged, Brown alleges that these false statements are "illustrative" of statements Montgomery and the other defendants made to third parties, which would make the statements actionable. *Id.*[9]

The Court finds that Brown's new allegations are not sufficient to state a claim for defamation. As a threshold matter, the Court already reviewed Montgomery's statements made in the context of the ARDC proceeding, which she made in a letter to the ARDC that was attached

---

[9] As the Court explained in its previous opinion, "[o]therwise defamatory material is . . . privileged if it arises 'during the course and as part of, a judicial proceeding if the matter has some relation to the proceeding.' " *Novoselsky v. Brown*, 822 F.3d 342, 353 (7th Cir. 2016) (citations omitted). That privilege, however, does not apply to statements concerning the proceeding made to third-parties. *Id.* at 354. Plaintiff here alleges that the defendants made statements consistent with Montgomery's outside the ARDC proceeding.

as an exhibit to the FAC. (Dkt. 49-1.) Although the Court only identified some specific examples of statements from the letter in its prior opinion, its ruling that Montgomery's statements were protected opinions, and thus not actionable for defamation, plainly applied to *all* of the statements she made in the ARDC letter that was attached to the FAC. *See Brown*, 2022 WL 767254 at *7–9. Thus, while Brown now cites to specific examples of Montgomery's statements from the letter, those allegations are not technically "new" as Brown claims, as the entire letter was incorporated as part of the prior complaint.

In any event, for the sake of completeness the Court will address each instance Brown uses now to support her defamation claim. As to Montgomery's statement that Brown violated an Illinois Rule of Professional Conduct, this statement is plainly an opinion. Montgomery states in her letter to the ARDC that Brown "arguably violated" Illinois Rule of Professional Conduct 1.9(c)(1), "notwithstanding [her] self-serving statement that she does not ask her clients for information on their assets or income in the course of her representation." (Dkt. 76-7 at 1).[10] Brown alleges this statement is false because there is "no plausible argument" that she violated the rule, as she did not require Hamilton to disclose his financial information. (Dkt. 76 ¶ 69.) Whether Brown "plausibly" or "arguably" violated a rule of professional ethics based on her conduct is an inherently subjective question that cannot be "objectively verified." Montgomery's statement simply reflects her own opinion on that question based on her interpretation of the facts, including

---

[10] The Court notes that Brown's complaint and briefing leaves out the qualifier "arguably" from Montgomery's statement to the ARDC, as well as the surrounding context, instead simply alleging that Montgomery affirmatively stated that Brown "violated Illinois' Supreme Court Rule of Professional Conduct 1.9(c)(1)." (Dkt. 76 ¶ 69.) But "[w]hen an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). Further, the Court "is not bound by a plaintiff's characterization of an exhibit," and may independently examine it. *See Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007). Brown bases almost her entire defamation claim on the belief that defendants repeated Montgomery's 'false' statements in her ARDC submission, which she has attached to the SAC. The Court may thus take an independent assessment of Montgomery's submission and need not accept Brown's characterization.

her belief that Brown's statement that she did not review Hamilton's financials was "self-serving." In short, the statement is inherently one of opinion and is not actionable for defamation.

The same reasoning applies to the statement that Brown "stalled negotiations" over the proposal to convert Hamilton's investment to a loan. Brown claims that this statement is false because *Montgomery* stalled the negotiations by attempting to force Brown to agree to "onerous" terms, taking a long time to respond to Brown's inquires, and repeatedly rejecting terms proposed by Brown. *See id.* The question of which side "stalled" negotiations over a business deal, however, does not have a precise or readily understood meaning, and different people might come to different conclusions based on the same facts. *See Hach v. Laidlaw Transit, Inc.*, No. 02 C 996, 2004 WL 2966946, at *5 (N.D. Ill. Nov. 24, 2004) ("one person's opinion as to whether a relationship has been disrupted might differ from another person's opinion."); *see also Brown*, 2022 WL 767254 at *9 ("[this] is the type of loose, figurative language commonly used by those who feel shortchanged in a business transaction."). Montgomery's statement is thus not one of objectively verifiable fact, but rather reflects her general opinion regarding who was to blame for the parties' failed negotiations, and Brown cannot maintain a claim for defamation based on such a statement.[11]

This leaves Brown's allegations that Montgomery falsely stated that Hamilton did not pay Brown for legal services and that Hamilton did not have legal representation in his initial investment into Legacy. These are statements of verifiable fact. In other words, it is objectively

---

[11] Brown's SAC contains other examples of allegedly false statements by Montgomery that she does not specifically raise in her response brief, but they are similarly ones of opinion and not verifiable fact. For example, Brown alleges that Montgomery falsely stated that Brown "improperly" accepted $125,000 from Hamilton, that Brown's actions were "highly suspect," that Hamilton wanted to "wash his hands" of involvement with Brown, that Brown attempted to "illegally amend" Legacy's operating agreement, and that Brown "mismanaged" the money she "unethically" accepted from Hamilton. (Dkt. 76 ¶ 69.) The Court already addressed many of these statements and held that they "simply consist of Montgomery's interpretation and subjective views of Brown's actions, and her submission details the facts that led her to those conclusions." *Brown*, 2022 WL 767254 at *10.

verifiable whether Hamilton in fact paid Brown for legal services, and whether he had legal representation as part of making his Legacy investment decision. But even assuming that the two verifiable facts that Brown now points to takes the Defendants' allegedly false statements out of the realm of a protected opinion, the Court nonetheless finds that Brown has failed to state a plausible claim for defamation.

"Claims of defamation are subject to specific pleading requirements." *Gardner v. Kappa Alpha Psi Fraternity*, No. 13 C 2865, 2013 WL 3724865, at *2 (N.D. Ill. July 12, 2013); *See Manjarres v. Nalco Co*., No. 09 C 4689, 2010 WL 918072, at *6 (N.D. Ill. Mar. 9, 2010) (stating the same) (citing *Dry Enters., Inc. v. Sunjut AS*, No. 07 C 1657, 2008 WL 904902, at *4 (N.D. Ill. Mar. 31, 2008)). While the Seventh Circuit has not addressed the exact pleading standard for claims of defamation, some courts in this district have required plaintiffs to state specifically the words alleged. *See Gardner*, 2013 WL 3724865, at *2 (collecting cases). The defamatory statements need not necessarily be alleged verbatim, but must be "sufficiently specific" to allow the defendant to "understand the nature of the claim and form a responsive pleading." *Id.* (citations omitted). In *Manjarres,* for example, the court found that the plaintiff's specific examples of defamation in his complaint were non-actionable opinions, and rejected the plaintiff's further argument that, "because the statements alleged in the complaint are *merely representative* and not an exhaustive list, the Court should permit him to perform discovery." *Manjarres*, 2010 WL 918072, at *6 (emphasis added). The court noted the specific pleading standards for defamation, and found that the plaintiff's general allegation that additional defamatory statements were made "at various times" did not provide the detail necessary to conform to those specific pleading standards. *Id.*

Here too, the Court finds that Brown fails to provide sufficient detail to state a claim. While Brown's SAC provides a long list of Montgomery's allegedly false statements to the ARDC, Brown's allegations that those statements were repeated to others are vague and conclusory. Brown alleges at several points "on information and belief" that Montgomery's statements to the ARDC are "illustrative of statements" Defendants made to third parties outside the ARDC proceedings, but provides no further details about which statements in particular she believes were repeated and to whom. (Dkt. 76 ¶¶ 69–70.) While Brown includes a long list of third-parties to whom Defendants allegedly directed defamatory statements, she provides no details of which Defendant allegedly made statements to which party, and what particular defamatory statements were made. *Id.* ¶ 75. Brown also fails to allege any specific time frames that the allegedly false statements were repeated to these third parties. Indeed, other than the general allegation that Goldston and Williams "made false statements to Williams in 2015 and 2016," the SAC lacks detail as to when any false statements were allegedly made. Similarly lacking in detail is Brown's general claim that, "on information and belief," Williams repeated false representations to former and prospective clients. *Id.* ¶ 7

In short, while Brown has pointed to a number of specific statements Montgomery made to the ARDC, her claim for defamation boils down to vague and generic assertions that one or more Defendants repeated "various" unspecified statements to various individuals at various times that are "like" those statements Montgomery made to the ARDC. The Court ultimately finds these allegations are too generalized, vague, and conclusory to provide the detail necessary to state a claim for defamation. *See Manjarres*, 2010 WL 918072, at *6.

The Court also finds that Brown's allegations explaining the basis for her belief that Defendants repeated false statements to others are far too speculative and lack sufficient detail to

state a plausible claim. Brown alleges she had two interactions, one with a former client and one with Hamilton's accountant, that led her to believe that that one of the Defendants told those individuals false representations about Brown's conduct. (Dkt. 76 ¶ 76.) In particular, Brown alleges that a former client who had always been friendly toward Brown became visibly and "inexplicably upset" on one occasion, which Brown attributes to the client being "falsely told" that Brown had taken advantage of Hamilton. *Id.* Brown also alleges that Hamilton's accountant, who is also related to a former JPMorgan advisor, was rude and dismissive to Brown, which she believed indicates that Defendants told the accountant false representations. *Id.* ¶ 77.

The fact that one former client and Hamilton's accountant displayed negative feelings toward Brown does not allow the Court to draw the reasonable inference that Montgomery, Williams, and Goldston, repeated specific defamatory statements about Brown to the broad range of third parties she claims. Brown does not, for example, allege when she met with the former client who had previously been friendly, or whether that client was still in active communication with Williams or any of Williams's coworkers at JPMorgan. Without this starting context, the Court cannot even begin to infer whether the change in the individual's attitude even had anything to do with any allegedly false statements made by one of the defendants. Regarding Hamilton's accountant, Brown provides no other context about this individual, such as whether she previously knew anything about Brown or had a particular opinion about Brown and her reputation. That this individual was "rude and dismissive" to Brown around the time of Brown's dealings with Goldston and Montgomery, which Brown admits were contentious, does not allow for the reasonable inference that Defendants repeated false statements to her. In short, both examples are highly speculative and insufficient to support Brown's generalized and vague allegations of defamation.

The Court recognizes that pleading "on information and belief" is a common way of

making allegations when the information is "peculiarly within the knowledge of the defendants." *See Brown v. Budz*, 398 F.3d 904, 914 (7th Cir. 2005) (citation omitted). However, "pleading 'on information and belief' is not a license to undertake a fishing expedition." *See Verfuerth v. Orion Energy Sys., Inc.*, 65 F. Supp. 3d 640, 647 (E.D. Wis. 2014). A plaintiff must still plead enough sufficient factual content that allows the Court to draw the reasonable inference that the defendants are liable for the misconduct alleged. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 551, 557 (declining to take as true the conclusory allegation "upon information and belief" that companies had entered a conspiracy without enough facts to make that statement plausible); *see also In re Darvocet, Darvon, and Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) ("The mere fact that someone believes something to be true does not create a plausible inference that it is true.") Here, even construing all facts in a light most favorable to Brown, the Court finds that Brown's allegations are far too vague and speculative to allow the Court to draw a reasonable inference that Defendants are liable for defamation. The Court thus finds she has failed to state a claim, and Count III for defamation must be dismissed.

### D. False light

The Court turns next to Brown's claim for false light against Goldston, Montgomery, and Williams, which is based on the same alleged statements underlying her defamation claim. A false light claim is an invasion-of-privacy tort, and is meant "to define and protect an area within which every citizen must be left alone." *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 210 (Ill. 1992); *Lovgren v. Citizens First Nat'l Bank of Princeton*, 534 N.E.2d 987, 988 (Ill. 1989). To state a false light claim, a plaintiff must allege that: (1) they were placed in a false light before the public as a result of the defendants' actions; (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (3) the defendants acted with actual malice, *i.e.*, with

29

knowledge that the statements were false or with reckless disregard to the truth of their statements. *Kolegas*, 607 N.E.2d at 209–10. "[S]tatements that are expressions of opinion devoid of any factual content are not actionable as false light claims," *Schivarelli v. CBS, Inc.*, 776 N.E.2d 693, 701 (Ill. App. Ct. 2002). Further, a false light claim cannot be maintained absent an allegation that some specific factual statement was false. *Salamone v. Hollinger Int'l, Inc.*, 807 N.E.2d 1086, 1093 (Ill. App. Ct. 2004) (referring to an allegation that "the statement was false" as "the most basic element of a false light cause of action.").

As discussed above, and in the Court's prior opinion, nearly every statement to which Brown points to as the basis of her false light claim is either an expressive opinion without a readily understood or precise meaning, or represents a defendant's subjective interpretation of underlying facts which are largely not in dispute. Such statements cannot support a false light claim.

Insofar as Brown now points to two isolated allegedly false statements in Montgomery's ARDC submission—that Hamilton did not pay Brown for legal services, and did not have an attorney represent him in his initial Legacy investment decision—she still fails to plead sufficient facts to satisfy all the elements of a false light claim. First, a false light claim requires publicity, which generally means that the statement was "made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." *Miller v. Motorola, Inc.*, 560 N.E.2d 900, 903 (Ill. App. Ct. 1990). The requirement of publicity may be satisfied by disclosure to a smaller number of people with whom Brown has a "special relationship," namely "a public whose knowledge of those facts would be embarrassing to the plaintiff." *Id.* But just as Brown's vague and conclusory allegations discussed above do not state a claim for defamation, the Court finds those allegations are not sufficient to show that any defendant publicized any specific false statement, either to the public at large or to

individuals with whom Brown has a special relationship. In short, Brown's conclusory allegations that Montgomery, Goldston, and Williams repeated unspecified statements at unspecified times do not support a reasonable inference that any defendant actually publicized the specific, allegedly false statements made in Montgomery's ARDC submission.

Brown also fails to allege that the particular false statements at issue would be "highly offensive" to a reasonable person. Instead, Brown generally alleges that Defendants' false statements would be highly offensive, and further argues that the false statement that she "took advantage" of an elderly client would be highly offensive in light of her reputation and work in estate planning. (Dkt. 81 at 11). That may be, but Brown has again attempted to attach her claim to a non-actionable opinion, not a statement of fact. The question is not whether the generic statement—that Brown "took advantage" of Hamilton—would be highly offensive to a reasonable person, because that statement is not one of fact and cannot support a claim for false light. The question is whether Defendants would have known that the specific allegedly false statements of fact that Hamilton did not pay Brown for her legal services, and did not have representation in the Legacy investment, would be highly offensive to a reasonable person in Brown's position. *See Chang Hyun Moon v. Kang Jun Liu*, 44 N.E.3d 1134, 1141 (Ill. App. 1st Dist. 2015) ("For a statement to be highly offensive, a defendant must have known that a plaintiff, as a reasonable person, would have been justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity." ) But Brown has not alleged any facts suggesting that publication of these two specific statements would be "highly offensive" to a reasonable person.

In sum, Brown has failed to plead sufficient facts stating a claim for false light against Montgomery, Goldston, and Williams. The claim is therefore dismissed.

### E. Civil Conspiracy

In Count VII of the SAC, Brown alleges that Goldston, Montgomery, and Williams, engaged in a civil conspiracy to commit the various tortious acts alleged in the other causes of action discussed above. However, a civil conspiracy claim "cannot stand where there are no underlying intentional torts that defendants could have conspired to perform." *Farwell v. Senior Servs. Assocs., Inc.*, 970 N.E.2d 49, 58 (Ill. App. Ct. 2012). As each of Brown's individual tort claims have now been dismissed, her civil conspiracy claim must be dismissed as well. *See, e.g., Est. of Brown v. Arc Music Grp.*, 830 F. Supp. 2d 501, 510 (N.D. Ill. 2011) ("[The plaintiff] has failed to allege adequately any of the tort claims underlying the alleged civil conspiracy, so it cannot stand.").

### F. Respondeat Superior liability

Finally, Count VIII of the SAC seeks to hold JPMorgan vicariously liable for Williams's conduct and the Firm vicariously liable for Montgomery's conduct. But since Brown has failed to plead any viable claim against Williams or Montgomery, there is no claim for which JPMorgan and the Firm can be held vicariously liable. *E.g., Ross v. Univ. of Chi.*, No. 18- CV-4200, 2018 WL 6448464, at *10 (N.D. Ill. Dec. 10, 2018). Count VIII is therefore dismissed.

### G. Dismissal with Prejudice

Having dismissed all claims in the SAC, the Court must determine whether to allow further amendment. Brown notably does not request a further opportunity to amend her complaint. Even if she had, the Court notes that Brown has already amended the complaint twice, once after her counsel appeared in this matter, and a second time after the Court's prior order dismissing the FAC. Given that Brown has failed to come forward with sufficient allegations to state claims for

relief after two opportunities to amend, including after an order from the Court outlining the deficiencies in the complaint, the Court does not find further opportunity to amend warranted.

## Conclusion

For all the foregoing reasons, Defendants' motions to dismiss are granted. The SAC is dismissed in its entirety, and the case is dismissed with prejudice.

ENTERED: 3/22/24

_____

Nancy L. Maldonado
United States District Court Judge